TELEFLEX INCORPORATED, Plaintiff,

v.

AMERICAN CHAIN & CABLE COMPANY, Inc., Defendant.

The MORSE INSTRUMENT CO., Plaintiff,

v.

AMERICAN CHAIN & CABLE COMPANY, Inc., Defendant.

Nos. 64 Civ. 1944, 2139.

United States District Court
S. D. New York.

Jan. 11, 1967.

William K. Kerr, of Fish, Richardson & Neave, New York City, for plaintff Teleflex Inc.; John O. Tramontine, Gerald J. Flintoft, New York City, Richard P. Barnard, Birmingham, Mich., of counsel.

Brumbaugh, Free, Graves & Donohue, New York City, for plaintiff Morse Instrument Co.; Everett R. Hamilton, Jack L. Renner, Akron, Ohio, of counsel.

Pennie, Edmonds, Morton, Taylor & Adams, New York City, for defendant; Willis H. Taylor, Jr., Charles J. Brown, Peter W. Krehbiel, New York City, of counsel.

## OPINION

McLEAN, District Judge.

In June 1964 plaintiff Teleflex Incorporated (Teleflex) brought an action for a declaratory judgment determining that Patent No. 3,015,969 issued on January 9, 1962 to Otto J. Bratz and assigned by him to his employer, defendant American Chain & Cable Company, Inc. (ACCO), is invalid and that products manufactur-

ed and sold by Teleflex do not infringe the patent. The complaint asks for an injunction restraining ACCO from suing, or threatening to sue, Teleflex or its customers for infringement. The complaint also asks for attorneys' fees. In July 1964 plaintiff The Morse Instrument Company (Morse) instituted a similar action seeking a declaration of invalidity of the patent and of non-infringement as to products manufactured and sold by Morse, plus an injunction, damages and attorneys' fees. By order of this court dated August 18, 1964, the actions were consolidated for all purposes.

In its answer in the consolidated action, ACCO has pleaded two counterclaims, one against each plaintiff, for a determination that the products manufactured and sold by each plaintiff infringe the patent. The counterclaims seek an injunction against each plaintiff, an accounting for profits, damages and an award of attorneys' fees.

In their replies to the counterclaims, plaintiffs assert that the patent, as well as being invalid, is unenforceable on various grounds, i. e., (1) because of a misrepresentation made by ACCO to the Patent Office in 1959, (2) because ACCO suppressed the invention by causing Bratz to delay unduly in applying for a patent, and (3) because ACCO's licensing policy constitutes a misuse of the patent.

Before this action was instituted, ACCO brought an action for infringement in the United States District Court for the Southern District of Florida against one of Teleflex's customers. That action, American Chain & Cable Company, Inc. v. Phillips Hardware, Inc., is still pending.

This court has jurisdiction of the present action under 28 U.S.C. § 1338(a).

The patent is on a "push-pull cable," a device which, most simply stated, consists of a wire or "core" enclosed in a tube which is surrounded by a wire casing. The core can be moved forward or backward by pushing or pulling on one end of it, thereby exerting force upon whatever is attached to the other end. It is used, among other things, to operate automobile accelerators, brakes, and throttles of marine outboard motors.

Including the three parties to this action, there are approximately 15 manufacturers of push-pull cables of one type or another in the United States. The parties have stipulated that ACCO was the "dominant" manufacturer during the period 1950–59.

The application for this patent was filed by Bratz on April 1, 1958. It was a continuation-in-part of a previous application filed by him on March 15, 1957 which he subsequently abandoned after it had been rejected by the Patent Office.

As far as Teleflex and ACCO are concerned, this litigation is the second battle in a war which began in the Patent Office. Teleflex's former employee, Cadwallader, also sought a patent on substantially the same cable. The Patent Office conducted interference proceedings beginning in 1959 between Cadwallader and Bratz. The Patent Office eventually decided in July 1961 that Bratz was the prior inventor.

In the meantime, Teleflex, as assignee of Cadwallader, in May 1960 petitioned the Patent Office to institute a "public use proceeding" against Bratz's application. It alleged that a cable embodying Bratz's claimed invention had been publicly used and sold by Fox River Manufacturing Company more than one year before March 15, 1957, the filing date of Bratz's original application. On November 3, 1961, the Patent Office denied Teleflex's petition on the strength of the Examiner's conclusion that Teleflex had not made out a prima facie case of such prior public use or sale.

The patent as issued on January 9, 1962 contains 16 claims. By agreement at pre-trial the claims to be adjudicated in this action have been limited to six, i. e., claims 1, 3, 4, 6, 8 and 16.

In the course of prosecuting the application for the patent, the attorneys for

Bratz (who are also ACCO's attorneys here) advised the Patent Office that:

"Claim 1 is a generic claim, both as to the casing structure and as to tube composition."

Claim 1 reads as follows:

"In a push-pull cable assembly, a casing comprising an outer metallic sheath formed of at least one wire wrapped helically in the form of a coil having its neutral bending axis extending substantially along the center line of the coil and a resinous plastic tube disposed within and extending throughout the length of said sheath, said plastic tube being restrained against over-all longitudinal movement relative to said sheath but being free to accommodate the slight relative motion that occurs between adjacent turns of the sheath coil when the casing is bent, and a flexible metallic·core element extending through said plastic tube and directly engageable therewith and freely movable longitudinally therein."

Claim 3 is the same as claim 1 except that the phrase "resinous plastic tube" in claim 1 has been changed in claim 3 to "polytetrafluorethylene tube." The trade name for polytetrafluorethylene is teflon.

Claim 4 reads as follows:

"A push-pull cable assembly comprising a resinous plastic tube, a flexible metallic sheath surrounding said tube, said sheath comprising a multiplicity of wires laid side by side and wrapped helically with a long pitch in the form of a closed coil having a neutral bending axis extending substantially along the center line of the coil, said sheath being applied in firm gripping relation with said plastic tube over substantially its entire length and holding it securely against over-all longitudinal movement relative to the sheath while permitting the slight relative motion that occurs between adjacent wires of the sheath coil when the sheath is bent, and a flexible metallic core element extending through said

tube and directly engageable therewith and freely movable longitudinally therein."

This claim is directed particularly to the cable construction of Fig. 1 of the patent drawings. It will be observed that this claim differs from the broad generic claim 1 in that the structure described in claim 1 as an outer metallic sheath "formed of at least one wire wrapped helically in the form of a coil" has been changed to a sheath "comprising a multiplicity of wires laid side by side and wrapped helically with a long pitch in the form of a closed coil * * * said sheath being applied in firm gripping relation with said plastic tube over substantially its entire length * * *."

Claim 6 is substantially the same as claim 4 except that the description of the plastic tube is more limited. The "resinous plastic tube" of claim 4 becomes a "polytetrafluorethylene tube" in claim 6. This claim also is directed to the structure shown in Fig. 1 of the patent drawings.

Claim 8 also relates to a polytetrafluorethylene tube in a metallic sheath comprising a multiplicity of wires wrapped in a coil as described in claim 6. Claim 8, however, includes "a binding wire wrapped helically with a relatively short pitch about said closed coil." It differs in various other respects from the language of claim 6. According to Bratz's attorneys' advice to the Patent Office, claim 8 is similar to claim 6 but defines "the casing structure, including the binding wire and the seizing members with increased particularity." This claim also relates to the structure shown in Fig. 1 of the patent drawings.

Claim 16 is somewhat different from the others. According to Bratz's attorneys, it is "specifically limited to the structure of Fig. 5" of the patent drawings. It includes "ferrules surrounding said sheath at each end thereof, said ferrules being compressed tightly against said sheath and compressing said sheath into firm gripping relation with the plastic tube * * *." This is the only claim

which refers to ferrules. These are a type of fitting at each end of the cable.

As far as the composition of the plastic tube is concerned, although this claim at the outset refers to "a resinous plastic tube," at the end it refers to "said nylon tube," thereby apparently indicating that in this instance the resinous plastic is nylon. This is the only one of the six claims here involved which specifies nylon as the plastic of which the tube is made.

Fundamentally, without regard for the moment to the variations and refinements of the respective claims, this device consists of three elements: (1) a metal core which actually does the pushing or the pulling, (2) a plastic tube or "liner" in which the core slides back and forth, and (3) a sheath or casing consisting of a coil of wire which envelops the plastic tube. The coil of wire has its "neutral bending axis extending substantially along the center line of the coil." This means, in substance, that the coil of wire is laid on in such a manner that when the entire assembly is bent, the length of the coil does not change. Were it otherwise, upon bending the coil would elongate and "swallow the core." The metallic sheath or casing grips the plastic tube and thereby reinforces it, but the tube is still "free to accommodate the slight relative motion that occurs between adjacent turns of the sheath coil when the casing is bent." The tube does not flatten upon bending, and since it remains circular, the core can continue to slide through it even when the cable is bent. The behavior of coils and tubes upon bending is well known to persons familiar with such matters.

I will first consider the issue of validity of the patent. Plaintiffs assert that the patent is invalid on several different grounds. First they say that the patent does not conform to the requirements of 35 U.S.C. § 112 in three respects: (1) the specification does not contain a description of the invention "in such full,

clear, concise, and exact terms as to enable any person skilled in the art * * * to make and use the same"; (2) the specification does not "set forth the best mode contemplated by the inventor of carrying out his invention"; (3) the specification does not point out and distinctly claim "the subject matter which the applicant regards as his invention." Secondly, plaintiffs contend that the patent is invalid under 35 U.S.C. § 102(a) and (b) because the invention is anticipated by the prior art and by a prior use of a similar cable. Finally, they maintain that the patent runs afoul of 35 U.S.C. § 103 in that "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art * * *."[1]

As to the first of these contentions, that based on Section 112, plaintiffs first argue that the patent is not sufficiently explicit because it makes no mention of special lubricants. The patent specification does refer to lubricants in two different passages. It states (Column 3, line 73):

"Preferably also a generous coating of a lubricant is provided in the tube to ease the axial movement of the core element."

And again (Column 5, line 37):

"The core element should be well lubricated inside the tube to facilitate its movement in the tube."

■ It is true that Bratz testified on his deposition that at one time ACCO conducted tests to determine the best lubricant for a nylon tube and decided that a certain formula was best for the purpose. Of the claims in suit, only claim 16 specifies nylon, hence plaintiffs' argument at most could apply only to that claim. But even as to that, the argument is weak. There is some testimony, not very extensive, it is true, to

1. In summarizing plaintiffs' contentions, I have inverted the order in which plaintiffs asserted them in their brief after trial. In that brief the argument based upon Section 112 was set forth last.

indicate that lubricants, although desirable, are not essential, and that the cable will work without any lubricant at all. Taken as a whole, the evidence does not convince me that a single special type of lubricant is necessary in order to enable the cable to operate satisfactorily, even with a nylon tube. I conclude, therefore, that the failure to specify a particular lubricant in claim 16 is not fatal to the validity of that claim under Section 112.

■ Plaintiffs argue further that the phrase "neutral bending axis extending substantially along the center line" is too indefinite. I do not agree. Although this phrase is mysterious to a layman at first blush, I am satisfied that its meaning is readily apparent to an engineer. Plaintiffs' contention that defendant's expert admitted that a push-pull cable may or may not have such a bending axis, depending upon how much it is bent, does not seem to me to be an entirely fair summary of his testimony on this subject on cross examination. He wound up by saying, "I would say it is quite conceivable that such a structure could be made." This is certainly far from conclusive. I hold therefore that the patent is not invalid on this ground.

I turn now to the remaining contention based on Section 112 which presents greater difficulty. It applies only to claims 1 and 4, which state that the inner tube is made of "a resinous plastic." The other claims in suit specify teflon or, in the case of claim 16, nylon. The specifications state repeatedly that nylon or teflon are the "preferred" materials. In addition, a long passage beginning at Column 7, line 5, is devoted to a discussion of the advantages over other plastics which nylon and teflon enjoy. Nylon and teflon are said to be "the most suitable materials," indeed, to be "almost unique

in their suitability for use in push-pull cable assemblies intended to transmit heavy forces." The specification states that numerous other "plastic compositions * * * have been tried for this purpose and found wanting," for a variety of reasons which are set forth at some length. The specification does not say what these unsuitable plastics are, or whether they are "resinous" or not. The specification then expands upon the excellent properties of nylon and teflon. There is no mention of any other plastic, resinous or otherwise, which might be suitable.

Defendant's expert testified that in fact there are other suitable plastics, but the patent shows no awareness of this fact on the part of the inventor. The evidence, although rather sketchy, also indicates that some of the "plastic compositions" which are not suitable are "resinous."

■ Anyone reading this specification with a view to making the invention would be foolhardy to use any plastic material other than teflon or nylon for the tube. He could not tell without independent experiment what other resinous plastic to use. The patent is not indefinite, for it clearly teaches that nylon or teflon should be employed. It is obvious, therefore, why most of the claims specify either one or the other of these two plastics which Bratz found satisfactory, but it is not so easy to understand why claims 1 and 4 are not so limited. Plaintiffs suggest that the explanation is that Bratz was seeking to obtain a monopoly on something broader than his invention. It is hard to escape the conclusion that this explanation is correct.[2]

■ There is authority for the proposition that a patent claim so broad

2. It may be noted that Bratz's original application, filed on March 15, 1957 and ultimately abandoned, claimed only a nylon tube. None of the claims of that application mentioned a "resinous plastic."

Defendant points out that several other patents in this field, including one assigned to Teleflex, also make broad claims in this respect. One refers to a "resinous plastic," one to "organic polymeric material," and one simply to "plastic." But if Bratz has claimed something which the patent laws do not permit him to claim, it is manifestly immaterial that others may have fallen into the same error. In any case, we are not concerned here with the validity of these other patents.

as to include materials which are not effective for the purpose of the invention is invalid. Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610 (1928); American Chemical Paint Co. v. Firestone Steel Products Co., 117 F.2d 927 (6th Cir. 1941); Hercules Powder Co. v. Rohm & Haas Co., 66 F.Supp. 899 (D.Del.1946).

Cases cited by defendant as, for example, Union Oil Co. of Calif. v. American Bitumuls Co., 109 F.2d 140 (9th Cir. 1940) and Yosemite Chemical Co. v. United States, 360 F.2d 948 (Ct.Cl.1966) are not in point. There the claim in question was narrowed, by reading it in the light of the specifications, to include only a part of the class of materials, and to exclude the rest. But this does not seem permissible here in view of Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124 (2d Cir. 1958), cert. denied, 358 U.S. 884, 79 S.Ct. 124, 3 L. Ed.2d 112 (1958). There a claim which was limited to a particular kind of plywood, i. e., plywood having a " 'wild' grain," was upheld, but claims which referred merely to "plywood" were invalidated under Section 112. The court said that the rule that the scope of claims should be limited in light of the specifications if necessary to uphold the patent, "applies only if the claims are ambiguous and it cannot serve to save claims which were intentionally drafted to obtain a statutory monopoly broader than seems to be justified." (258 F.2d at 135) In any event, to limit claims 1 and 4 to nylon and teflon would serve no useful purpose here, for claim 1 would then be merely duplicative of claims 2 and 3 and claim 4 would be the same as claims 5 and 6.

■ I conclude that claims 1 and 4 are invalid because of their failure to comply with the requirement of Section 112 that the claims must particularly point out and distinctly claim "the subject matter which the applicant regards as his invention." This conclusion, of course, does not dispose of the case, for we still have claims 3, 6, 8 and 16 to consider.

■ I turn now to plaintiffs' second charge of invalidity, i. e., that the patent does not comply with 35 U.S.C. § 102(a) and (b) because the invention is anticipated by the prior art and by a prior use of a similar cable. I will take up first the contention as to prior use.

Plaintiffs claim that a cable embodying Bratz's claimed invention had been publicly used and sold more than one year before the original filing date of Bratz's application. This is the contention which, as previously noted, was rejected by the Patent Office in 1961. It involves the so-called Fox River cable which had a relatively brief and somewhat unhappy commercial life in the mid-1950s. This cable was manufactured by Fox River Manufacturing Company. The tubing was made by a subcontractor on its behalf. Fox River sold the cable to a a few customers. Some of it was sold "in bulk," i. e., in long lengths which the purchaser might cut to the particular length which he desired.

This cable embodied the invention of the Schroeder patent issued on April 9, 1957 and assigned by Schroeder to Fox River. Fox River's manufacture of the cable antedated the issuance of the patent. It began in early 1955. The cable ultimately proved to be unsatisfactory. In 1958, Fox River turned over its cable manufacturing business to a manufacturer of hydraulic jacks, who seems to have made a little of the cable until 1961, when all operations ceased.

The Schroeder patent discloses a cable which employs, not one, but two plastic tubes, one inside the other. The inner tube is made of "Saran," described, perhaps inaccurately, as a copolymer of acrylonitrilevinylidene chloride. The outer tube is made of polyethylene. The core wire slides back and forth in the inner tube.

There are certain metal wires between the two tubes. These are wrapped around the outer circumference of the inner tube and are imbedded in the inner circumference of the outer tube. The ends of these wires project beyond the ends of the plastic tubes. They are to be

affixed to an end fitting or ferrule at each end of the cable after the cable has been cut to the desired length. When they are so affixed, they lend strength to the plastic tube.

These wires are "spaced," i. e., there is an appreciable distance between the coils. Apparently in the course of manufacturing this cable, Fox River gradually increased the number of wires, starting out with three, then going to four, and eventually winding up with eight. Even with eight, however, the wires were still "spaced." They did not constitute a "full complement" of wire, i. e., a coil in which the turns of wire are so close together that there is no room for another.

The Patent Office Examiner decided that this cable did not disclose the invention defined in the Bratz application. He relied primarily on the fact that the spaced wires do not constitute a "sheath" as described by Bratz, i. e., in the language of the patent in suit, "a casing comprising an outer metallic sheath formed of at least one wire wrapped helically in the form of a coil having its neutral bending axis extending substantially along the center line of the coil."

I agree with this result. It is unnecessary to formulate a precise definition of "sheath" in order to conclude that the separate wires of the Schroeder cable are not one, or at least not one like Bratz's. The "sheath" in Schroeder's invention would appear to be the outer plastic tube, not the wires. Bratz's structure differs fundamentally from Schroeder's. I conclude that the two cables are so dissimilar that the manufacture and sale of the Schroeder Fox River cable was not such a prior use and sale as to invalidate the patent in suit under Section 102 (b).

This leaves for consideration plaintiffs' remaining contention under Section 102 that Bratz's claimed invention was anticipated by prior patents. Plaintiffs also assert that, whether anticipated or not, the claimed invention was "obvious" and hence invalid under Section 103. In discussing the prior patents, it will be helpful to keep both points in mind. Furthermore, almost inextricably bound up with these contentions is plaintiffs' further claim that Bratz and ACCO made certain misrepresentations to the Patent Office in the course of prosecuting the application, which misrepresentations, plaintiffs say, make the patent unenforceable, or, at the very least, destroy the presumption of validity which it would otherwise enjoy. It will be convenient to set forth the facts pertaining to this contention, which was hotly contested at the trial, in the course of reviewing the prior patents.

On January 23, 1940, the Patent Office issued to Bratz Patent No. 2,187,873, which he assigned to ACCO, on "flexible wire tubing." Despite the dissimilarity in name, this patent, like the patent in suit, is on a push-pull cable. The tube in which the core element slides back and forth is metal, rather than plastic. This is the only significant difference between the two cables. Defendant's expert testified that except for the difference in the tube or liner, "the two structures are virtually identical."

The 1940 patent expired 17 years after its issuance, i. e., on January 23, 1957. Bratz filed his original application for the patent in suit some two months later, on March 15, 1957. At or about that time, there were outstanding in the hands of others several different patents which disclosed the use of plastics in the structure of push-pull cables of various types. In addition to the Schroeder patent previously mentioned, issued on April 9, 1957, there was patent 2,382,966 issued to Arens on August 21, 1945, which employed a "non-metallic sleeve member * * * preferably formed of that class of materials known as plastics, or the like."

More important for our purposes was a Belgian patent issued to Landis on June 30, 1953 on a "Bowden control." A Bowden coil is a simple coil of wire like a door spring. Landis' invention disclosed a nylon tube inside a Bowden coil, with a metal core which moved back and forth in the nylon tube.

There was also a German patent issued in 1954 (exact day and month of issuance uncertain) on a Bowden control "provided with a sheath of plastic," and a British patent, issued to Phillips on November 30, 1944, on a "flexible duct" for "flexible remote control cables." This consisted of a metal tube enclosed within an outer covering of a "thermosetting resin."

As far as patents on wire casings, as distinct from tubes, are concerned, there was also, in addition to Bratz's expired patent 2,187,873, another expired patent, 1,951,723, issued to Burd, et al. on March 20, 1934, on a "metallic conduit" comprising a core in a metal tube which was surrounded by a sheath of helically coiled wires.

Bratz's original application for the patent in suit, containing eight claims, was filed on March 15, 1957. It was rejected in toto by the Examiner. The Examiner stated on July 25, 1957:

"All claims are rejected as unpatentable over Schroeder in view of Miller and Dring.

* * *

"Claims 1 and 6 are further rejected as obviously fully met by Landis."

Bratz urged the Examiner to reconsider, with the result that on January 28, 1958, the Examiner reaffirmed his decision. He rejected all eight claims as unpatentable over Fig. 3 of Landis in view of various other patents. Bratz thereupon abandoned his application. Before doing so, he filed, on April 1, 1958, his present continuation-in-part containing 16 claims.

The Examiner rejected this application also. On October 6, 1958, he said:

"Claims 1–3 and 12–16 are rejected as met by Arens.

* * *

"Claims 4–6 and 9–11 are rejected as being unpatentable over Arens in view of Burd et al.

* * *

"Claims 7 and 8 are rejected as being unpatentable over Arens in view of Bratz."

On March 5, 1959, the Examiner added another ground to his objection. He stated:

"Claims 1–16 are further rejected as being unpatentable over Landis et al, of record, in view of any one of Burd et al or Bratz, all of record. Landis et al discloses the concept of a core and plastic sleeve held by a metallic sheath. The purpose of the plastic sleeve is to minimize the friction which results from metal to metal contact. Landis et al recites that the plastic sleeve may by polyamide, polyurethane or polyethylene; but nylon is preferred. To substitute the sheathing means of either Burd et al or Bratz would not amount to invention.

"No claims are allowed."

Bratz responded to this "Office Action" by submitting to the Examiner a lengthy written argument on March 16, 1959. This failed to change the Examiner's mind. In another "Action" dated April 2, 1959, the Examiner stated that he had considered "applicant's well reasoned argument" but that nevertheless all claims were rejected "as being unpatentable over Landis et al in view of Bratz or Burd," and that this rejection was "FINAL." [3] By way of explanation, the Examiner said:

"The position of the Office is that Bratz and Burd et al have solved problems in the art related to the sheathing whereas Landis has solved the problems of friction in a Bowden cable by his invention. The fact that applicant has combined the embodiments of Bratz and Burd et al on one hand to solve particular probelms of the art with the embodiment of Landis to solve other problems of the art does not make their combination patentable, because the commendable attributes are already present in each embodiment."

At this point Bratz and ACCO put on before the Examiner the physical demon-

---

3. Capital letters and underscoring in original.

stration which has provoked so much controversy in this case. They contended that the Landis cable would not work as well as Bratz's cable, particularly when it was severely bent. To prove this contention, ACCO and Bratz made up samples of cables purportedly made in accordance with the Bratz claims, and other samples purportedly made in accordance with the Landis patent. They showed these to the Examiner and invited him to push and pull the respective cores. The Examiner did so and observed that even when the cables were not appreciably bent, the Bratz samples pushed and pulled easier than the Landis samples. When the respective samples were severely bent to a diameter of 2⅝″, the Landis cable would not operate at all, whereas the Bratz cable could still be pushed and pulled, although with some difficulty.[4] The Examiner was impressed. He suggested that Bratz and ACCO submit an affidavit describing the respective samples so that there would be a written record of the demonstration. In accordance with this request, an affidavit, sworn to by Bratz on May 1, 1959, was submitted to the Patent Office. The data in the affidavit was supplied by Bratz. The affidavit was prepared by a member of the firm of patent attorneys which represented Bratz and ACCO and which represents ACCO in the present action.

The affidavit set forth the dimensions of the various parts of the respective samples. It said that the core element in each sample was a steel wire cable 0.137″ in outside diameter. It said that the tube in each sample was made of nylon, that the inside diameter of the tube used in the Bratz sample was 0.178″, and that the inside diameter of the tube used in the Landis sample was larger by 0.012″, i. e., 0.190″. This difference in the inside diameter of the respective tubes was actually in favor of the Landis sample because it afforded a slightly greater clearance between the core and the tube than that afforded by the Bratz sample.

The effect of this demonstration upon the Patent Office was magical. On September 30, 1959, the Examiner reversed himself, withdrew his rejection of the Bratz application, and allowed all 16 claims, subject to the ultimate outcome of two interference proceedings then in progress, one between Bratz and Teleflex's employee, Cadwallader, and another between Bratz, Cadwallader and a third inventor, Botti.

After this, Bratz was uniformly successful in his struggle to obtain a patent. The Botti interference was dissolved upon a finding by the Examiner that Botti's application did not disclose a "push-pull cable assembly having a sheath comprising a coil having its neutral bending axis extending substantially along the center line of the coil." Therefore, Botti was not eligible to compete with Bratz to determine their respective dates of invention.

Bratz won the interference with Cadwallader, whose claims were substantially the same as Bratz's, because Bratz was found to be the prior inventor. Teleflex's last ditch effort to attack the Bratz application by a petition for a "public use proceeding" based on the Schroeder Fox River cable, was defeated. Bratz emerged triumphant with the issuance of the patent to him on January 9, 1962.

As some indication of the quantity of patents issued by the Patent Office in this crowded field, it may be noted here that Bratz subsequently obtained another patent 3,130,754 issued on April 28, 1964, on "push-pull cable casings" which is not involved in this action, and Teleflex subsequently obtained, through its assignors, still two more patents on push-pull cables, patent 3,063,303 issued to Cadwallader on November 13, 1962, and patent 3,238,808 issued to Barnard on March 8, 1966. These patents are also immaterial for present purposes since they relate to minor improvements which are not involved here.

---

4. Bending to a diameter of 2⅝″ is a sharper bend than would normally be encountered in actual commercial use of the cable. It is also sharper than the bend which ACCO's present advertising literature recommends to its customers.

The problem which now confronts me arises from the fact that the evidence in this case demonstrates that Bratz's affidavit of May 1, 1959 was wrong. The core of the respective samples demonstrated to the Patent Office did not have an outside diameter of 0.137″. The diameter was larger, so that there was less clearance between the core and the inside of the tube. Just what the diameter of each core was has never been established.

This situation was brought to light in the following manner. During the course of pre-trial discovery in this action, plaintiffs asked ACCO to produce the samples which it had demonstrated to the Patent Office in 1959. ACCO said that it no longer had them, that they had been left with the Patent Office. Inquiry by ACCO's attorneys of the Patent Office in an effort to obtain the samples was unavailing. Apparently the Patent Office had thrown them away.

ACCO's attorneys thereupon agreed to make up and deliver to plaintiffs' attorneys new samples identical with those which ACCO and Bratz had demonstrated in 1959. I have no doubt whatever that plaintiffs' attorneys properly understood this undertaking to be a promise by ACCO to prepare samples having the dimensions set forth in the Bratz affidavit.

ACCO made up such samples of the respective cables, each having a core of 0.137″ diameter. Upon manipulating them, ACCO found to its dismay that the Landis sample operated substantially as well as the Bratz sample. ACCO thereupon proceeded to make up other samples with the deliberate purpose of producing a sample of the Landis cable which would perform as inadequately as the Landis sample which ACCO had submitted to the Patent Office in 1959. After some trial and error, ACCO discovered that if the diameter of the core was increased to 0.162″, this result was attained, i. e., as in 1959 the Bratz sample would work reasonably well if severely bent, whereas the Landis sample would not. Defendant's attorneys then sent these new samples to plaintiffs' attorneys with a covering letter which, although it correctly set forth the dimensions of the samples so transmitted, did not state that these samples were not the samples which they had promised to furnish.

Plaintiffs' attorneys, of course, discovered the discrepancy. They then made elaborate tests of their own, many of which were repeated in open court. The net upshot was that it was effectively proved that the samples demonstrated by Bratz and ACCO in 1959 to the Patent Office could not have been made as the Bratz affidavit claimed, at least as far as the dimensions of the core are concerned.

Defendant points out that these newly fabricated 1966 samples of Bratz and Landis cables each have a core of the same diameter, i. e., 0.162″. Defendant claims that the cores in the 1959 samples, whatever their diameter may have been, were at least the same in each cable. Defendant offered no proof of this, however. We have no record, other than the now discredited Bratz affidavit, to show what the core dimension actually was. Bratz, under whose supervision the 1959 specimens were made, was not called as a witness on this subject by either side.[5]

What effect does all this have upon the validity of the Bratz patent? In considering that question, I have tried to keep separate the evidence as to ACCO's actions in 1959 from the evidence of its actions in 1966. Although ACCO and its attorneys may well be thought to have been less than candid in dealing with plaintiffs' attorneys in 1966, it does not follow from this that they misrepresented the facts, intentionally or otherwise, to the Patent Office in 1959.

---

5. Bratz, although now retired from ACCO, is still employed by it as a consultant. It was suggested that he is now in poor health, but there is no convincing evidence of this.

Plaintiffs took Bratz's deposition twice, both times before the facts heretofore related came to light. They apparently made no effort to examine him again thereafter.

We know that the Bratz 1959 affidavit was incorrect in its statement of the diameter of the core. The affidavit, of course, was then claimed by ACCO to be true. It was not wholly true. Hence, in submitting it, ACCO, strictly speaking, made a misrepresentation.

■ But I am not persuaded that this misrepresentation was intentional or that it was material. If, in fact, the cores of the respective Bratz and Landis samples were of the same diameter, and if that diameter was in accordance with the claims of Bratz's application and Landis' patent, then it makes no difference that the diameter was larger than 0.137".[6] The samples would still be comparable and the difference in their performance would still indicate that Bratz's cable worked better than Landis'. Hence, the error in stating the correct dimensions of the core would not be a material misrepresentation.

Plaintiffs suggest that even in that case the demonstration was unfair because both samples were too sharply bent. But this fact is not determinative, for it was demonstrated in court that when the 1966 samples, admittedly of equal core diameter, were only slightly bent, Bratz operated appreciably more easily than Landis. This much, at least, of the 1959 demonstration was fair, if in fact the samples were not rigged.

There is no evidence that they were. On the other hand, there is no evidence that they were not. Although the absence of conclusive evidence is unfortunate, this much at least we know from the 1966 experiments. A specimen of a Bratz cable with a core diameter of 0.162" and a specimen of a Landis cable with a core of the same diameter, each core being somewhat smaller than the inside diameter of the tube, and each core, as far as appears, being within the permissible limits of size disclosed by the Bratz application and the Landis patent,

will manifest, upon bending, the same characteristics as the 1959 samples did. We know also from the evidence that there is a physical reason for this difference in the performance of the two cables. The plastic of the Landis tube has a grooved outer surface. The plastic penetrates slightly between the turns of the wire casing. Thus, when the cable is bent, the wall of the tube tends to collapse and to restrict the movement of the core. This condition does not obtain in the Bratz cable, which has a smooth plastic tube which does not penetrate between the turns of the surrounding coil.

■ It is thus entirely possible that ACCO's 1959 demonstration was made with fair comparable samples having core dimensions substantially the same as those used in the 1966 demonstrations in court. Under these circumstances, and in the absence of any direct evidence to the contrary, I am unwilling to find as a fact that ACCO in 1959 made a misrepresentation to the Patent Office, other than the mistake in Bratz's affidavit, which may well have been immaterial. Plaintiffs have the burden of proof on this issue. I conclude that plaintiffs' charge of material misrepresentation, intentional or otherwise, has not been proved. It follows that the patent is not unenforceable on this ground, nor is the presumption of validity destroyed. See Corona Cord Tire Co. v. Dovan Chemical Corp., supra; Corning Glass Works v. Anchor Hocking Glass Corp., 253 F.Supp. 461 (D.Del.1966).

■ We come now to the nub of the case, as far as the issue of validity is concerned. In Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the Supreme Court made clear that there are three conditions of patentability, each of which must be satisfied if a patent is to be held valid. The

---

6. Neither the Bratz application nor the Landis patent specifies a precise dimension for the core. One may obtain a general idea of the proportions of the respective parts of the cable from looking at the drawings in the application and in the Landis patent. But these drawings do not purport to be accurate down to small fractions of an inch.

article must be (1) useful; (2) novel; and (3) nonobvious.

 I find that none of the prior patents, in and of itself, discloses Bratz's claimed invention. There are prior patents which disclose a similar metal casing, and other prior patents which disclose a plastic tube, but there is no single patent which discloses the exact combination of these elements which Bratz claimed. The cable is therefore novel. The evidence also shows that it is useful.[7] The first two conditions of patentability have thus been satisfied. I conclude that the patent is not invalid under Section 102.

Section 103 is a different matter. That section provides:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains * * *."

 The section was construed by the Supreme Court in *Graham*. The Court there said:

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may

have relevancy." (383 U.S. at 17–18, 86 S.Ct. at 694)

See also in this connection Formal Fashions, Inc. v. Braiman Bows, Inc., (S.D.N.Y.1966), 254 F.Supp. 389, 369 F.2d 536 (2d Cir. Dec. 16, 1966), in which the *Graham* rule was followed and applied.

At the outset of this discussion, I note and reject defendant's contention that "any doubts as to 'non-obviousness' * * * are overcome by the attitude taken by Teleflex in the Patent Office * * *."

 It is clear, as defendant recognizes, that Teleflex is not estopped by any inconsistency between its present contention and the position which it took in the Patent Office proceedings. Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 55 S.Ct. 449, 79 L.Ed. 997 (1935).

 In the Patent Office, Teleflex and ACCO each sought a patent on this cable. Bratz won and Teleflex had to settle for a patent on an improvement. The fact that two different people representing two different companies each had substantially the same idea at approximately the same time, does not make Bratz's claimed invention less obvious. On the contrary, to my mind, it makes it more so.

 There is evidence that Bratz's cable had commercial success. Defendant's production of plastic lined cable rose from zero in early 1958 to over 70 million feet in 1965. It's production of metal lined cable declined in the same period from some 45 million feet in 1958 to slightly less than 5 million feet in 1965. No sales figures were provided, but it may reasonably be inferred that sales of the two types of cable increased and decreased, respectively, roughly in proportion to production.

 There is little, if any, evidence of "long-felt but unsolved needs." Defendant was the "dominant" seller of

7. Plaintiffs in effect concede as much in their post trial brief, p. 32, and reply brief, p. 7.

metal lined cable from 1950 to 1959. It apparently decided in 1958, after Bratz had applied for the patent, to push the production and sale of plastic lined cable and to correspondingly curtail production of metal lined. There is nothing to indicate that prior to 1958 defendant's customers were dissatisfied with the metal lined cable or that they were demanding a plastic lined one. Defendant was in no hurry to put a plastic lined cable on the market. The point of view of defendant's sales manager was that defendant should stick to its metal lined cable as long as its competitors did not come out with a successful plastic lined one. The short-lived Fox River cable posed no serious threat to defendant. One of Fox River's principal customers resumed buying metal lined cable from defendant after it found Fox River plastic lined cable unsatisfactory.

 In any event, commercial success and long-felt needs are "but secondary considerations" on the issue of obviousness. The primary consideration is the nature and extent of the differences between the patent in suit and the prior art. Solution of this question is not free from difficulty, and in considering it the court must be continually on guard against the natural tendency to treat as obvious *something which appears simple in the light of hindsight, but which may not actually have been so at the time of the invention.* As is so often the case, the question comes down, in the final analysis, to a matter of a common sense judgment upon the basis of underlying facts as to which there is no real dispute. *Other cases having different facts are of little or no assistance in reaching that judgment.*

The metal lined cable covered by Bratz's expired patent 2,187,873 was *highly successful in practice.* It had a casing of helically coiled wire which worked well with the metal liner. Bratz put a smooth plastic tube of nylon or teflon in that same casing. That worked well also. This is all that Bratz did. This is his claimed invention.

 The fact that a plastic liner is superior to a metal one in that it keeps out dirt and moisture, a fact which defendant emphasizes, goes to show only that Bratz's cable is useful. It does not prove that it is not obvious.

 As I have pointed out, several other people had the idea of using a plastic tube to enclose the movable core. Landis also had the idea of putting his plastic tube in a metal casing. Landis' tube, it is true, unlike Bratz's, had a grooved surface. But there were other patents, notably the British patent 565,863 issued in 1943, and the German patent 1,679,561 issued in 1954, which disclosed a tube with a smooth surface.[8]

As far as the type of plastic is concerned, Bratz specified nylon and teflon. Nylon was known for this purpose. The Landis tube was made of it. And teflon was not Bratz's invention. Patent 2,400,099 issued to Brubaker on May 14, 1946 was on a process for obtaining shaped articles from teflon. Palmer, who made the tubes for the Fox River cable, considered using teflon as early as 1955 and decided against it only because it was too expensive. Strang, defendant's expert, first became familiar with teflon some time between 1947 and 1951.

The Patent Office seems to have concentrated on the Landis patent. For a long time it consistently rejected Bratz's application because of Landis. Then Bratz and defendant put on their demonstration with the samples and the Patent Office changed its mind.

What this demonstration showed, assuming, as I do, that it was honest, was that Bratz's cable worked better than Landis' when bent. There were two differences between Bratz's construction and Landis' which accounted for this differ-

---

8. The Patent Office did not cite either the British or the German patent. To some extent, this weakens the presumption of validity. *Lorenz v. F. W. Woolworth Co.,* 305 F.2d 102 (2d Cir. 1962); *Zoomer, Inc. v. Paillard Products, Inc.,* 258 F.2d 527 (2d Cir. 1958), cert. denied, 358 U.S. 908, 79 S.Ct. 237, 3 L.Ed. 2d 230 (1958).

ence in result. Defendant strongly urged both upon the Patent Office. One I have already mentioned, i. e., the grooves in the Landis plastic liner. The other was the fact that the Bowden coil of the Landis cable did not have a neutral bending axis along its center line. Therefore, when the Landis cable was bent, it tended to "swallow the core." The demonstration and defendant's emphasis upon these two differences of construction convinced the Patent Office that Bratz's cable was different from Landis'. Thereupon the Patent Office granted the patent.

But it is immaterial, for present purposes, that Bratz's cable was different from Landis', that Bratz's metal casing was different from Landis' Bowden coil. It makes no difference that Bratz's cable proved to be more flexible than Landis'. The point is that the metal casing disclosed by the patent in suit is the same old metal casing disclosed by Bratz's earlier expired patent. It has the same neutral bending axis along the center line. It has the same gripping relationship with the tube, firm enough to support it, but loose enough to "accommodate the slight relative motion that occurs between adjacent turns of the sheath coil when the casing is bent."

When the Patent Office granted this patent, Graham v. John Deere Co., supra, had not yet been decided. Until that decision came down, it had been widely supposed that Section 103 relaxed the standard of patentability. See Note The Standard of Patentability—Judicial Interpretation of Section 103 of the Patent Act, 63 Colum.L.Rev. 306 (1963).

The Patent Office may have had that view. But *Graham* held that this is not

so. The standards are the same as they were before Section 103 was enacted in 1952.

 I cannot escape the conclusion that Bratz's combination of the old element of a smooth plastic tube with the old element of his own metal casing was obvious "to a person having ordinary skill in the art." [9] It was certainly obvious to Cadwallader, who attempted to do substantially the same thing. In seeking this patent, defendant attempted, by substituting a plastic tube for a metal one, to obtain an extension for another 17 years of the monopoly which it had previously enjoyed and which had enabled it to dominate the push-pull cable industry. The evidence here does not justify such an extension. I conclude that claims 1, 3, 4, 6, 8 and 16 of the patent are invalid because of their failure to meet the requirement of Section 103.

This conclusion makes it unnecessary to consider plaintiffs' other contentions that the patent is unenforceable because of alleged suppression and misuse. It is likewise unnecessary to consider the question of infringement.

This leaves for decision only plaintiffs' request for attorneys' fees. Plaintiffs claim that this is an "exceptional case" within the meaning of 35 U.S.C. § 285.

 The general rule is that an award of attorneys' fees must be based upon a finding of bad faith on the part of the losing party. AMP Incorporated v. Burndy Corp., 332 F.2d 236 (3rd Cir. 1964), cert. denied, 379 U.S. 844, 85 S.Ct. 84, 13 L.Ed.2d 49 (1964); Park-In-Theaters, Inc. v. Perkins, 190 F.2d 137 (9th Cir. 1951).

9. I have viewed the situation as it existed at the time of the filing of Bratz's original application on March 15, 1957. By that date, all the patents which are pertinent to the question of obviousness had been issued, except the Schroeder patent. The application for that patent, however, had been filed on July 5, 1955, and hence that patent also may properly be considered on this question. Hazeltine Research, Inc. v. Brenner, 382 U.S. 252, 86 S.Ct. 335, 15 L.Ed.2d 304 (1965).

Defendant does not claim a date of invention prior to March 15, 1957. It has not attempted to meet the heavy burden of proof which rests upon a patentee who claims a date of invention prior to the filing date of the application. Oelbaum v. Lovable Company, 211 F.Supp. 594 (S.D.N.Y.1962), aff'd, 322 F.2d 1022 (2d Cir. 1963); see Helene Curtis Industries, Inc. v. Sales Affiliates, Inc., 233 F.2d 148 (2d Cir. 1956), cert. denied, 352 U.S. 879, 77 S.Ct. 101, 1 L.Ed.2d 80 (1956).

I do not consider that defendant's actions in vigorously asserting its patent or in adhering to its licensing policy constitute bad faith. Plaintiffs also argue that bad faith can be found in the 1959 demonstration in the Patent Office and in the conduct of defendant and its attorneys in 1966 with regard to the 1966 samples. As to the 1959 demonstration, I have held that plaintiffs' charge remains unproved. As to defendant's failure in 1966 to inform plaintiffs' attorneys expressly of the fact that the samples which defendant then delivered to plaintiffs' attorneys were not the same as those which defendant had promised to supply, I prefer to take a charitable view. Moreover, I am not persuaded that this incident necessitated as elaborate a testing program as that upon which plaintiffs then embarked. After careful consideration, in the exercise of the court's discretion, the request for attorneys' fees is denied.

Pursuant to Rule 52(a) this opinion constitutes the court's findings of fact and conclusions of law.

Plaintiffs are entitled to the declaratory judgment and the injunction prayed for in the complaint, with costs. Defendant's counterclaims are dismissed.

Settle judgment on notice.