**EASTERN ELECTRIC, INC., Plaintiff,**

v.

**The SEEBURG CORPORATION, a Pennsylvania Corporation, Defendant.**

**No. 60 Civ. 983.**

United States District Court,
S. D. New York.

July 11, 1969.

Charles Trynin, Arthur March, Willkie, Farr, Gallagher, Walton & FitzGibbon, New York City, by Sumner S. Kittelle, William T. Sullivan, Charles E. Lewis, New York City, of counsel, for plaintiff.

Burgess, Ryan & Hicks, Hanse H. Hamilton, Townley, Updike, Carter & Rodgers, William P. Hindman, Jr., Richard Lutz, New York City, Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., by Ronald L. Engel, Chicago, Ill., of counsel, for defendant.

McGOHEY, District Judge.

This is an action for breach of contract. Eastern Electric, Inc. [Eastern] is a New York corporation. The Seeburg Corporation [Seeburg] is a Delaware corporation. The amount in con-

troversy exceeds $10,000 exclusive of interest and costs. The court, to which the action was tried without a jury, has jurisdiction of the parties and subject matter. The findings and conclusions appear in the opinion.*

Pursuant to a written purchase agreement dated April 8, 1958, Eastern assigned to Seeburg's predecessor, among other things, nine patents and two applications for patents (hereafter, the assigned patents) relating to electrical cigarette vending machines.[1] Seeburg became obligated by Paragraph 2(b) of the purchase agreement to pay Eastern specified royalties on each electrical cigarette vending machine Seeburg sold which utilized the invention disclosed in any claim of any of the assigned patents. Paragraph 16 provided among other things that Seeburg "without being subject to the [purchase agreement's] restrictions * * * in any respect, [could] acquire, lease, manufacture, deal in, sell or otherwise dispose of cigarette vending machines other than those within the scope of the [assigned patents]" and that in the event Seeburg did so, either it or Eastern could, subject to certain additional stated conditions, terminate the purchase agreement on six months' written notice. The full text of Paragraph 16 is set out in the margin.[2]

* Trial transcript references will be designated R–. Plaintiff's and defendant's exhibits will be designated PX– and DX– respectively.

1. The original parties to the purchase agreement (PX–1) were Statler Manufacturers Corp. as seller and Fort Pitt Industries as buyer. Statler which was then negotiating to, and eventually did, acquire control of Eastern, contracted to cause the latter to assume Statler's obligations under the purchase agreement and Eastern did so in an "Assumption Agreement" dated April 21, 1958 (PX–2). Fort Pitt later became Seeburg.

2. "Buyer [Seeburg] at any time hereafter and without being subject to the restrictions of this Agreement in any respect may acquire, lease, manufacture, deal in, sell or otherwise dispose of cigarette vending machines other than those within the scope of the Vending Machine Patents, and Seller [Eastern] shall not have any right to receive any payment in respect of the sale by Buyer [Seeburg] of any cigarette vending machines which are outside the scope of the Vending Machine Patents, nor shall Seller [Eastern] have any other rights in respect thereof under this Agreement, it being expressly agreed that this Agreement applies only to the sale of Vending Machines by Buyer [Seeburg] in the manufacture of which one or more of the Vending Machine Patents is utilized. However, Buyer [Seeburg] and Statler agree, and Statler agrees that it will cause Seller [Eastern] to agree that in the event Buyer [Seeburg] at any time while it is obligated to make payments to Seller [Eastern] under paragraph 2(b) hereof shall undertake to engage in the business of acquiring, leasing, manufacturing, selling or otherwise dealing in electrical cigarette vending machines which are outside the scope of the Vending Machine Patents, and Buyer [Seeburg] does not make payments to Seller [Eastern] on such electrical cigarette vending machines which are outside the scope of the Vending Machine Patents in the same amounts and manner as Buyer [Seeburg] is obligated to make in respect of Vending Machines under paragraph 2(b) hereof, then either Seller [Eastern] or Buyer [Seeburg] shall have the option of terminating this Agreement by giving at least six months prior written notice of such termination to the other party, and that upon the expiration of such six months period Buyer [Seeburg] shall assign and deliver to Seller [Eastern] the Vending Machine Patents, all improvements on the Vending Machine Patents, and any patents issued on such improvements which Seller [Eastern] elects to include in said sale, and the Special Equipment, upon

(a) Payment by Seller [Eastern] to Buyer [Seeburg] of the sum of One Dollar;
and

(b) Seller [Eastern] entering into an agreement with Buyer [Seeburg] by which Seller [Eastern] shall assume all obligations under the Hoban Agreement and indemnify Buyer [Seeburg] from further liability thereunder.
and nothing in this paragraph 16 shall be construed as obligating Buyer [Seeburg] to transfer or assign to Seller [Eastern] any patents, inventions or improvements which were not embraced in the Vending Machine Patents and were created and developed after the Closing and which Buyer [Seeburg] is using or ex-

The first electrical cigarette vending machines manufactured and sold by Seeburg, designated model E–1, concededly embodied at least one claim of one of the assigned patents and concededly the agreed royalties were paid to Eastern on each E–1 sold. Early in June 1959 Seeburg discontinued the sale of the E–1 and introduced two new models of its own manufacture, designated E–2 and E–2XM. Later it made and sold additional models. It has not paid royalties on its E–2 or later models, contending they are not within the scope of any of the assigned patents. On November 30, 1959, Seeburg wrote Eastern that it "hereby exercises its option to terminate [the purchase agreement] pursuant to Paragraph 16 thereof * * *"[3] Eastern's reply dated December 4, 1959, rejected Seeburg's claimed right to terminate.[4]

The complaint contains two counts. The first alleges that the E–2 embodies the invention disclosed in at least one claim of one of the assigned patents and demands payment of the specified royalties on each E–2 sold. This was later expanded to demand royalties on some of Seeburg's later models also. The second count asserts an alternative claim in the event the first is not sustained. It alleges that the purchase agreement imposed on Seeburg an implied obligation to "exploit [the assigned patents] in good faith and to refrain from newly creating or adopting commercially equivalent machines outside the scope of the [assigned patents]" and seeks damages for the alleged breach of that obligation.

*The First Count*

At the start of the trial Eastern asserted in its Trial Brief (p. 9), that the E–2 and all later Seeburg models embodied the disclosures of at least four of the assigned patents, namely, patent 2,593,102 (PX–78) (covering the means for delivering a package of cigarettes and matches); patent 2,455,976 (PX–88) (covering the means for ejecting cigarettes); patent 2,960,373 (PX–102) (covering the cabinet enclosure and container mechanism); and design patent 186,788 (PX–15) (covering the design of the vending machine cabinet.)[5] Aft-

pects to use in the manufacture of electric cigarette vending machines which are outside the scope of the Vending Machine Patents. In the event Buyer [Seeburg] shall have become obligated to pay any royalty or other charge in respect of any such patents, inventions and improvements required to be assigned to Seller [Eastern] as above set forth, Seller [Eastern] shall assume such obligation and indemnify Buyer [Seeburg] against any further liability in respect thereof.

"Nothing in this paragraph 16 shall be construed as releasing Buyer [Seeburg] from its obligation to pay as and when due whatever principal or interest may remain unpaid on Buyer's [Seeburg's] note provided for in paragraph 2(a) (ii) hereof.

"If Seller [Eastern] shall exercise the option of terminating this Agreement as provided in this paragraph 16 and Buyer [Seeburg] within sixty days after receipt of Seller's [Eastern's] notice of termination shall either (a) furnish Seller [Eastern] with satisfactory evidence of Buyer's [Seeburg's] intention to discontinue as soon as practicable the business of acquiring, leasing, manufacturing, selling or otherwise dealing in electrical cigarette vending machines which are outside the scope of the Vending Machine Patents, and if Buyer [Seeburg] as soon as practicable does so discontinue such business, or (b) Buyer [Seeburg] makes the payments in respect of such electrical cigarette vending machines in the amounts and in the manner it is required to make in respect of the sale of Vending Machines under paragraph 2(b) hereof, then in either such event such exercise by Seller [Eastern] of its option to terminate this Agreement shall become null and void and this Agreement shall continue as theretofore in full force and effect."

3. DX–BA.

4. DX–BB.

5. These patents are hereafter designated by the last three digits in their respective numbers, e. g. '102. Patents '788 and '373 were issued on December 1, 1959, and November 15, 1960, respectively, upon applications pending when the purchase agreement was executed and pursuant thereto assigned to Seeburg. During the trial Eastern unsuccessfully

er trial Eastern reduced its contentions to two and these involve only two of the assigned patents. First it contends that, the disclosures of claims 1 and 2 of '102 are embodied in the Seeburg models which contain match dispensing mechanisms. Secondly it contends that, the design disclosed in '788 is embodied in the cabinet used in Seeburg's models E-2, E-2XM, BE-2, B4E-2 and 4E-2.[6]

Seeburg challenges both contentions but does not challenge the validity of either patent. Eastern's final contentions will be considered in order.

I.

THE '102 PATENT

This patent was issued April 15, 1952, to Mario Caruso on his application which had been filed on December 26, 1946. It embraces seven claims of which only the first two are in issue here. They are:

"1. In a vending machine, the combination with a cabinet having a movable front, of a mechanism in the cabinet and including rear and front magazines for different articles and ejecting means for both, and a common chute between said magazines for the reception of ejected articles, said front having a framed aperture cooperating with said chute when the front is closed.

"2. In a vending machine as in claim 1, said front magazine being operatively connected with and being movable relative to said rear magazine when said front of the cabinet is open."[7] Dispute centers on the common chute and framed aperture elements of claim 1 and the operative connection element of claim 2.

*The Common Chute*

The claims initially presented to the Patent Office were concededly "rather broad"[8] and contained no mention of "a common chute between [the] magazines."[9] Thus the original claim 24 which disclosed the combination of holders for different articles (i. e. the magazines) with ejector means for each and an article selector mechanism, contains no mention of a chute or of any other delivery means.[10] This claim was rejected "as reading directly on Fry, Brodie, Hoban 2,076,564 and Hoban 2,333,-176."[11] The closest reference to a delivery chute appeared in the original claim 32, also a combination claim, which provided in part for "delivery means for the simultaneous reception of articles ejected from both holders * * *."[12] This claim was "rejected as unpatentable over Hoban 2,076,564 in view of Hoyt."[13] Claim 32 was then amended to locate the article delivery means as "being disposed in the space separating the two holders."[14] and claim 24 was amended to include, among other things, a reference to "a chute for the reception and guidance of articles from both holders arranged in the space between the holders * * *"[15] The applicant noted in his "Remarks" that amended claim 24 now brought out various features, among

sought to withdraw from evidence patent '373 after its invalidity was established by proof of public sale of items embodying its disclosures more than twelve months before the Patent Application was filed on March 25, 1958.

6. Eastern's Post-Trial Brief re Count 1. The E-2 and E-2XM differ only in that the former is equipped to store and dispense both cigarettes and matches, while the latter is equipped to store and dispense only cigarettes. The BE-2 differs from the E-2 only in the color of the cabinet and the same is true of the B4E-2 and the 4E-2. Hereafter E-2 refers to all the accused models.

7. PX-78, col. 28, lines 58-69.

8. See, e. g. R-3417 line 6.

9. The '102 File Wrapper, DX-BO.

10. Id. at pp. 79-80.

11. Id. at p. 122. Of the cited patents those of Fry, Brodie and Hoban 2,333,176 are in evidence as DXs, DY-1, DY-7 and DY-6, respectively.

12. Id. at p. 87.

13. Id. at p. 123.

14. Id. at p. 144.

15. Id. at p. 138.

them being "that between the two article magazines is provided a chute for the reception and discharge of articles from both magazines. All such features" he said "are foreign to any one of the references advanced against these and the rest of the claims criticized. It is believed that the inclusion of these features definitely render [sic] these claims patentable over the references." [16] Amended claim 24 nevertheless was rejected, as indeed were all amended claims 7 through 32, on the ground that although individual elements therein might have been patentable, the disclosed combinations of them were not.[17]

In response to this office action, combination claims 33 through 38 were added. Although each of these referred to a chute, in some of them, i. e., claims 35 and 37, the reference was to a "common chute," serving both magazines located "in the space separating the magazines," [18] while in others, i. e., 33 and 34, the reference was solely to the "chute" or to the chute located "between" the two magazines.[19] A reading of all the relevant claims discloses and it is accordingly found that in stating them, the applicant intended to and did use the words "chute" and "common chute" interchangeably; and that he also used interchangeably the expressions "between" and "in the space separating."

Prior to any action by the Examiner, the added claims 33 through 38 were amended and claims 2 through 32 were cancelled. In his "Remarks" at this time the applicant stated, with reference to amended claims 33 through 38, that none of the prior art patents "disclosed the arrangement of a fixedly mounted set of main magazines disposed in rear and spaced from a frontal set of secondary magazines, and wherein within the space between the two magazine sets a common chute for both magazines sets is provided * * *." [20]

These amended claims 33 through 38 were also rejected, the Examiner noting: "Further, the specific details of the dispensing mechanisms does [sic] not add, in a patentable sense, to the alleged inventive concept in the arrangement and association of the magazines, the chute and the hinged closure as recited in claim 33." [21] In response to this office action the applicant cancelled claim 38 and amended claims 33 through 37.[22] The "Remarks" of the applicant again underscored the importance of the location of the chute.[23] After several oral interviews with the Examiner, a supplemental amendment was filed cancelling claims 33 through 37 and substituting claims 39 through 45 which were approved and which now appear as claims 1 through 7.

■ From the foregoing it appears and is accordingly found that the original broad claims, which were rejected in light of the prior art, were finally narrowed considerably by the applicant. Throughout the patent office proceedings which followed the rejection of his original claims, the applicant included in both his new and amended claims reference to a delivery chute located *between* the two article magazines, and in his "Remarks" he emphasized that this was one of the features which rendered his machine patentably different.[24] It is also clear and is accordingly found that when, throughout the patent office proceedings, the applicant alternately referred to "a chute between the magazines" and "a common chute in the space separating the magazines" he was refer-

16. Id. at pp. 152–153.

17. Id. at pp. 158–159.

18. Id. at p. 162 [claim 35]; p. 165 [claim 37]. See also p. 165 [claim 36] and p. 169 [claim 38].

19. Id. at p. 161 [claim 33]; p. 162 [claim 34].

20. Id. at p. 177.

21. Id. at pp. 179–80.

22. Id. at pp. 181–196.

23. Id. at pp. 198, 213.

24. See, e. g. File Wrapper id. pp. 169–170, 177.

ring to one and the same thing.[25] Therefore, the plaintiff is now estopped to assert that *any* delivery means for the reception of ejected articles will fall within the scope of the '102 patent. Because the patent applicant added *the common chute between the magazines* to patentably differentiate his machine from the prior art, and because he strenuously and successfully urged this differentiating feature on the Examiner, Eastern will not be permitted now to eliminate this feature from the patent claims.[26]

It is undisputed that a patentee, in drafting his claims, is permitted to be his own lexicographer.[27] Where, however, there is no indication that the words employed are intended to have any special or unique meaning their usual meaning will be employed in interpreting the claims.[28] Furthermore, the claims are to be read in light of the specifications and the drawings and, although the specifications are merely an example of what is claimed,[29] they are useful interpretive aids.

In the vending machine disclosed in '102 (PX–78) the cigarette magazine, which is located in the rear of the cabinet, consists of a number of individual vertical containers (also sometimes called "magazines") for packages of cigarettes. Immediately in front of the cigarette magazine is the delivery chute and in front of this chute is the match magazine and its ejector mechanism. The match magazine, like the cigarette magazine, is composed of individual vertical containers in which several books of matches may be stacked. The means for ejecting a package of cigarettes includes an elevating device, located generally beneath the cigarette magazine, which causes the packages of cigarettes within an individual magazine to be elevated. The ejector mechanism, located generally above the cigarette magazine, consists of a movable carriage which, during a delivery cycle, will be propelled forward. Attached to and suspended downward from this movable carriage is the individual ejector arm which engages with the elevated top package of cigarettes and pushes it forward into the delivery chute. The match ejector means is attached to and extends rearwardly from the same channel member which supports the match magazine. In simplified terms, sufficient for this discussion, the match ejector means consists of a ratchet wheel which, on being rotated, permits a spring to snap a lever combination causing the ejector lever to swing rearwardly pushing a book of matches into the chute. During each succeeding delivery cycle, a book of matches will be ejected from a different container, thereby ensuring that no single container will be emptied while others remain filled.

The chute which is referred to in the claim, described in the specifications and shown in the drawings, especially Fig. 7, is a single enclosed unit exemplified by DX–Q. It extends down from just below the top of the cabinet, and is disposed in the space separating the cigarette magazine and the match book magazine. The chute structure consists of a rear wall (270) which extends upward to a point (271) just below the level of the top packages in the cigarette magazine. From this point a deflector plate (272) extends downward and forward for a short distance. Its function is to ensure direction of ejected packages of cigarettes into the chute. The rear wall ex-

25. See Mastini v. American Telephone & Telegraph Company, 369 F.2d 378, 379 (2d Cir. 1966) cert. denied.

26. Graham v. John Deere Co., 383 U.S. 1, 33, 86 S.Ct. 684, 15 L.Ed.2d 545 (1965); Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., 372 F.2d 263, 270 (2d Cir. 1967).

27. Turchan v. Bailey Meter Co., 167 F. Supp. 58, 65 (D.Del.1958); see also Ellis, Patent Claims § 203 (1949) and cases cited therein.

28. Application of Storrs, 245 F.2d 474, 480, 44 CCPA 981 (1957); In re Tamarin, 187 F.2d 160, 162, 38 CCPA 872 (C.C.P.A.1951).

29. See, e. g., Reiner v. I. Leon Co., 285 F.2d 501, 504 (2d Cir. 1960), cert. denied, 366 U.S. 929, 81 S.Ct. 1649, 6 L.Ed.2d 388 (1961).

tends straight down to the area where ejected matches enter the chute, and then curves forward (278). The front wall of the chute (275) which begins at point 273 extends downward, then rearward (276) and finally downward again. Thus ejected packages of cigarettes pass through a narrowed area of the chute (277) and then into its horizontal extension, denominated in the specifications as the "chute mouth" (14′). Beneath the match magazine is a rearward extending plate (278′) ending in a cylindrical formation (278″) which defines the upper portion of the chute mouth. This extension, with its cylindrical end, is designed to facilitate the proper ejection of matches into the chute mouth.

As described in the specifications, this operation with respect to the cigarettes is as follows:

> "As a pack of cigarettes is ejected from its magazine, it first passes over top edge 271 of inner wall 270, and falls against deflector plate 272. From there it is forced into contact with frontal wall portion 275 and is turned against deflecting wall portion 276, which directs it through chute passage 277 into mouth 14′."

With respect to the matches, the operation of the chute is described as follows:

> "This forceful rearward movement of the match ejector means brings the latter into engagement with and causes the ejection of the lowermost book of matches into chute XIV. The cylindrical end formation 278″ of inward extension 278′ within the chute facilitates the placement of the ejected book of matches into accessible position at chute mouth 14′."

The front wall of the chute, in addition to guiding the cigarettes into the mouth of the chute, serves the added function of preventing the cigarettes from interfering with the operation of the match ejector mechanism which extends rearward from the match magazine. The rear wall also has a function in addition to merely guiding the cigarettes into the chute mouth and that is to prevent the cigarettes from re-entering one of the individual cigarette magazines, or from interfering with the elevating device.

There was considerable testimony by two experts supporting different interpretations of the word "common" as applied to the chute referred to in claim 1. Eastern's expert, Mr. Kelley, was of the opinion that the term "common chute" refers only to that portion of the chute structure through which both the ejected cigarettes and matches actually pass, namely, the lowest portion. Seeburg's expert, Mr. Hughes, was of the opinion that the term refers to the entire chute structure since that is used by all of the individual cigarette containers and all of the individual match containers. Both views seem equally plausible when only the literal words of the claim are considered. Kelley's is less so, however, when it is considered, as it must be, in light of the File Wrapper history already discussed and in light of the specifications and drawings. The specifications constantly refer to the entire chute, a single unit which is given the over-all designation of a single numeral: XIV.

To limit the words "common chute" to that unit's lower area through which both the cigarettes and matches pass would exclude from the claim the greater portion of the unit's area as shown and would also present practical difficulties of construction since the chute disclosed in the drawings and described in the specifications is a single unit. If the Kelley interpretation were to be adopted, there would be no clear demarcation of where the "chute" ends and the "common chute" begins. Furthermore, since the matches are ejected at a point lower than the bottom of the cigarette magazine, the only area of the chute through which both cigarettes and matches pass is *beneath* or *below*, rather than *between*, the magazines. Eastern attempts to reconcile this obvious mislocation of the common chute by interpreting the word "between" as meaning not "in the space separating" but rather "beneath," as in the case "where two people stand on either side of an opening in the street, there is

no doubt that the opening exists 'between' them, although it may be physically beneath them." [30] While that example might present a situation where the word "between" actually relates to something which is "beneath," there is nothing in the claims, the specifications or the drawings which indicates that this was the meaning intended by the patentee. In fact, there are numerous uses in the specifications of the word "between" none of which connotes the meaning suggested by Eastern [31] and, where the meaning of "beneath" or "below" was intended, such words were specifically employed.[32] Finally, the File Wrapper history negates Eastern's theory since throughout the Patent Office proceedings the patentee used the words "between" and "in the space separating" interchangeably.

Although Eastern's expert, Kelley, has designated a portion of the chute which, being actually used by both the cigarette and matches, fits his technical definition of "common," it is not between, i. e., in the space separating, the magazines. His view of the meaning of the word "common" as applied to the chute is rejected. The Hughes interpretation is in conformity with the location of the entire chute structure as stated in the claim and specifications and as shown in the drawings. It is adopted as correct.

The E–2 (DX–A) is an electric vending machine consisting of a cabinet having a rear and two side walls, a top and a floor. It rests on four legs and encloses parts for storing packages of cigarettes and books of matches together with mechanisms for delivering both to purchasers through an opening at the bottom of a front door. The latter is hinged to the forward edge of the left wall and affords access to the enclosed parts. In the rear of, and extending almost the full length of, the cabinet is a set of vertical containers for packages of cigarettes (hereafter "the rear magazine"). In front of this is a set of similar containers for books of matches (hereafter "the front magazine").[33] The latter, which extends from a point close to the top of the cabinet down to a point just a little more than half way to the floor, is supported on a transverse plate which is hinged to a housing called the "hat section" on the left wall of the cabinet. When the cabinet door is closed there is little more than one inch of space separating the front and rear magazines. When the cabinet door is open the front magazine may be swung forward on its hinge and thereby afford access to the rear magazine.

Both cigarettes and matches are ejected from the bottom of their respective containers by mechanisms which are electrically activated when coins of appropriate value are inserted into the machine. The match ejecting mechanism is positioned directly beneath the front magazine. A metal plate hereafter called a "match deflector," is attached to the rearward face of the front magazine at a point just above the level of the upper surface of the lowermost books of matches. This plate serves to prevent ejected books of matches from getting into cigarette containers in the rear magazine. It slants downward and rearward for about an inch and a half until it is almost flush with the forward face of the rear magazine to which it is equal in width. From this point, which is just about level with but opposite to the bottom of the front magazine, the deflector plate extends straight down, still almost flush against the forward face of the rear magazine, to a point slightly above the level of the upper surface of the lower-

30. Eastern's Post-trial Reply Brief Re Count I, p. 11.

31. See, e. g. (PX–78) Specifications, col. 8, line 33; col. 9, line 72; col. 11, lines 3, 7.

32. See, e. g. id. Specifications, col. 9, line 32; col. 8. line 25.

33. An additional magazine consisting of a set of bottom discharging cigarette containers is attached to the inner side of the cabinet door but Eastern does not contend that this embodies either of the '102 claims here in issue. It is mentioned later in the opinion but only for the limited purpose there apparent.

most package of cigarettes, whence it slants forward and down. Only the lowermost inch and a half of the space separating the front and rear magazines is occupied by the deflector plate. Its greater part, by far, exists below the level of the bottom of the front magazine. That, indeed, is the only part of the plate which actually deflects ejected matches since these, which are forcefully pushed rearward and downward from the bottom of the front magazine, can come in contact with only so much of the deflector plate as is below that level.

Attached to the lower end of the forward face of the rear magazine, just above the point where ejected cigarettes emerge, there is a metal baffel which slants forward and down. This extends across the full width of the rear magazine and is parallel with and below the lowest forward-slanting portion of the deflector plate. The baffel's leading edge is also forward of and below the leading edge of the lower end of the deflector plate.

A strip of light metal extends across the openings through which ejected packages of cigarettes emerge from the forward face of the rear magazine. This strip called "the empty bar" is movable and is held in a vertical position by light springs until a delivery cycle commences, whereupon it is depressed forwardly to a horizontal position by the emerging package of cigarettes which is pushed forward and then downward under the baffel. This movement of the empty bar operates an electric switch which energizes a solenoid which, in turn, electrically activates the match ejecting mechanism.

Beneath the rear magazine and equal to it in width, is a metal plate called the "upper delivery tray" (DX–FL). This slopes down toward the front of the cabinet, ending flush against another metal plate called the "delivery tray." The latter is a horizontal inward extension of the lower section of the front door and constitutes the floor of the opening therein through which cigarettes and matches are delivered to a purchaser.

Just beneath the cigarette magazine attached to the inner side of the cabinet door and equal in width to that magazine, there is a metal plate which extends rearward for a short distance and then curves downward and forward. Attached to the lower end of this plate which is called the "upper package guide" (DX–FL), and constituting an extension of it, is another metal plate called the "lower front package guide," which extends further down and forward and ends at the opening in the cabinet door. When the latter is closed, an area is formed which has an upper forward boundary consisting of the "upper package guide" and the "lower front package guide," and a lower rearward boundary consisting of the "delivery tray" and the "upper delivery tray."

A delivery of articles from the rear and front magazines proceeds as follows. A bottom package of cigarettes in the rear magazine is pushed forward under the baffel and directed downward. This causes it to depress the empty bar and thereby electrically activate the match ejecting mechanism. The package of cigarettes falls to and slides down the "upper delivery tray," coming to rest on the "delivery tray." A book of matches having been pushed rearward and down from the bottom of the front magazine by the activated match ejector, falls down against the deflector plate to the "upper delivery tray" and thence to the "delivery tray." There both articles are accessible to the purchaser through the opening in the door of the cabinet.

Claims 1 and 2 of '102 are somewhat abstract and so it is possible to read them literally on Seeburg's E–2. However, a word by word correspondence is not enough.[34] The essence of the invention

34. Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, 568, 18 S.Ct. 707, 42 L.Ed. 1136 (1898); Grubman Eng'r & Mfg. Co. v. Goldberger, 47 F.2d 151 (2d Cir. 1931); White Machine Company v. Bon Ton Cleaners & Dyers, 190 F.Supp.

disclosed, given its proper latitude, is what Seeburg must be found to have utilized.[35] It is readily apparent that in detail the E–2 is unlike the disclosure made in claim 1, but this is not controlling either,[36] for a mere colorable difference or a mere adaptation of the patent teaching will not take the accused machine outside the scope of the patent.[37] For example, the fact that the E–2's one-piece match deflector which leads into a separate chute does not correspond exactly to the '102 disclosure of a single unit chute which has front, rear and side walls is not decisive. The E–2's match deflector, being an inclined plane, is within at least the dictionary definition of "chute."[38] And by using separate parts instead of one integral structure, Seeburg might be said to be merely adapting the teaching of claim 1 by using an equivalent.[39]

There is, nevertheless, an essential difference between the E–2 chute and the one disclosed in '102, by reason of the former's location and operation. '102 pertains to a machine employing a top discharging and forward ejecting cigarette magazine.[40] Accordingly, since both its cigarette and match magazines extend downward from the top of the cabinet, it was essential that the cigarettes pass through an enclosed structure in the space separating the magazines. The E–2 on the other hand, employs bottom discharging magazines for both cigarettes and matches and since the latter, on ejection, fall through a space below the match magazine, they do not, and indeed cannot pass through the space separating the cigarette and match magazines. Such space exists only above the point where the matches are ejected. The space through which the ejected matches initially pass, if it is to be given boundaries, exists between the cigarette magazine in the rear of the cabinet and the one located on the inner side of the front door.[41] The cigarettes in the E–2's rear magazine are ejected at a point below the level of the bottom of the match or front magazine and therefore they, too, do not pass through the space separating the rear and front magazines.

The E–2 does utilize a distinctly defined "chute * * * for the reception of ejected articles" the form of which resembles generally the lowermost portion of the chute disclosed in '102.[42] The E–2 chute, however, is located well beneath the front (match) magazine and generally forward of both it and the rear (cigarette) magazine. It is not located "between said magazines" as disclosed in claim 1 of '102.

██ In an action between an assignor and his assignee the assigned patent will be given as broad a scope and as

807, 816 (D.N.J.1961); Curtiss-Wright Corporation v. Link Aviation, Inc., 182 F.Supp. 106, 122 (N.D.N.Y.1959).

35. Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., supra note 26.

36. See American Technical Machine Corp. v. Caparotta, 339 F.2d 557, 560 (2d Cir. 1964), cert. denied, 382 U.S. 842, 86 S.Ct. 65, 15 L.Ed.2d 83 (1965).

37. Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., supra note 26; see also Rich Products Corporation v. Mitchell Foods, Inc., 357 F.2d 176 (2d Cir.), cert. denied, 385 U.S. 821, 87 S.Ct. 46, 17 L.Ed.2d 58 (1966).

38. Webster, Third Int'l Dictionary Unabridged 405 (1963): "chute * * * 2: an artificial or natural inclined plane, sloping channel, or partially or completely covered passage (as a trough, framework) down or through which substances or bodies (as water, coal, ore, grain, or logs) may pass or slide usu. to a lower level. * * *"

39. See Ellis, Patent Claims § 57 (1949).

40. The opening words of the Specifications of the '102 patent (PX–78 Col. 1 lines 1–7) are: "This invention relates broadly to coin-operated vending machines and the various instrumentalities employed therein, one of which being a merchandise supporting and elevating device, identified as Self-Propelled Traveling Device in co-pending application, serial No. 591,733. * * *"

41. See PX–79.

42. See PX–78 Fig. 7; PX–79; PX–152.

wide a range of equivalents as is possible.[43] That scope, however, is determined initially by reference to the File Wrapper and the prior art.[44] Where the patent was issued in a crowded field and where it relates, at least in part, to form or location, it will be strictly and narrowly construed.[45] It must be noted here that the "chute" portion of '102 relates to a means and not a function; that most, if not all, vending machines will employ some means for delivering the purchased articles to the customer and that the '102 chute is only one such means.

Eastern argues that '102 should be afforded a broad scope because, as it contends, the patent disclosed the first "all-electric" cigarette vendor. Without passing on the merits of this contention which it is not necessary to do, it is sufficient to note that claim 1 involves only purely mechanical elements and, accordingly, the asserted pioneer status of the patent, if it has such status, does not broaden the scope of claim 1 as to the chute element.

The state of the art which existed when '102 was under Patent Office consideration, was, concededly, crowded.[46] Seeburg relies on numerous prior art patents all of which relate to vending machines containing two separate containers for dispensing articles and a chute through which both ejected articles pass for delivery to a purchaser. Eastern argues that the prior art patents relied on by Seeburg should be accorded but little weight because none of those patents cover "all-electric" cigarette vending machines. It again stresses its contention that the '102 patent discloses a machine in which the selection and ejection of articles are effected by electrically activated mechanisms whereas in the prior art patents these operations are effected by manually operated mechanisms. Since, however, claim 1 relates only to mechanical devices, the relevant prior art includes those patents which dealt with the mechanical problems of delivering ejected articles to the purchaser.[47]

The Goretta patent 2,085,153 issued June 29, 1937 (DX–DY(2)) relates to a coin operated vending machine. It discloses a cabinet containing a front magazine for cigarettes and a rear magazine for matches with a space existing between these magazines (Fig. 4). Separate ejector means for each magazine cause a package of cigarettes and a book of matches to be delivered simultaneously to the customer via a common chute located beneath the magazines (49). During a delivery cycle, the bottom package of cigarettes is rearwardly ejected and drops through the space between the magazines into the chute. The bottom book of matches is forwardly ejected and it too drops through the space between the magazines into the chute. The chute structure is an inclined metal plate attached to the rear wall behind the rear magazine. It curves downward and then slants forward towards the front of the cabinet, ending at a point just beneath the bottom edge of an opening in the lower front wall of the machine, through which the customer may retrieve the purchased articles.

43. Freeman v. Altvater, 66 F.2d 506 (8th Cir.), cert. denied, 290 U.S. 696, 54 S.Ct. 132, 78 L.Ed. 598 (1933); Frank Associates, Inc. v. Columbia Narrow Fabric Co., 33 F.Supp. 279 (S.D.N.Y.1940).

44. Graham v. John Deere Co., supra note 26; Scott Paper Co. v. Marcalus Mfg. Co., 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47 (1945); Hooker Chemical Corp. v. Velsicol Chemical Corp., 235 F.Supp. 412, 437 (W.D.Tenn.1964); Garland v. Remington Arms Company, 137 F.Supp. 622 (S.D.N.Y.1956).

45. American Technical Mach. Corp. v. Caparotta, supra note 36; Reiner v. I. Leon Co., 324 F.2d 648, 650 (2d Cir. 1963); American Seating Co. v. Ideal Seating Co., 124 F.2d 70, 72 (6th Cir. 1941).

46. See '102 File Wrapper (DX–BO, p. 153, last par.)

47. Graham v. John Deere Co., supra note 26; Mandel Bros., Inc. v. Wallace, 335 U.S. 291, 69 S.Ct. 73, 93 L.Ed. 12 (1948); Endevco Corporation v. Chicago Dynamic Industries, Inc., 268 F.Supp. 640, 655 (N.D.Ill.1967).

The Rowe patent 2,159,603 issued May 23, 1939 (DX–DY(3)) relates to a coin vending machine. It discloses a cabinet containing front and rear magazines with separate ejector means for each (Fig. 3). The front, cigarette magazine, is the larger of the two. Behind and attached to this is the match magazine. It begins at the same height as the cigarette magazine but extends down only about one-half the latter's length. The magazines are attached to each other in such a way that there is no space existing between them. During a delivery cycle, the bottom article in each magazine is rearwardly ejected. The magazines are located in the center of the cabinet with sufficient space existing behind the rear, match magazine, to permit the matches ejected from that magazine, to drop through the space between it and the rear wall to a downward sloping metal plate (Fig. 3, J). The space through which the matches pass, begins generally at a point lower than the match magazine. The cigarettes are ejected at a point below where the matches are ejected and then drop with the matches to the downward sloping plate (Fig. 3, J). This constitutes a common chute which terminates at a point abutting an opening in the front of the cabinet where the customer may retrieve the purchased articles.

The Neidig patent 2,320,378 issued June 1, 1943 (DX–DY (5)) relates to a coin operated vending machine. It discloses a cabinet containing front and rear magazines for, respectively, cigarettes and matches and separate ejector means for each (Fig. 2). Both magazines are bottom discharging, matches being ejected forwardly at the same time cigarettes are ejected rearwardly. The bottom of the match magazine which is affixed to the rear wall of the cabinet, extends forward from the latter at a point about level with the vertical center of the cigarette magazine. During a delivery operation, a book of matches and a package of cigarettes drop down to a plate which curves down from a point on the rear wall below the match magazine and extends forward to the lower edge of an opening in the front of the cabinet. Another plate extends from below the cigarette magazine and curves down and forward to the upper edge of the opening in the front of the cabinet. The plates just described constitute the upper and lower boundaries of a common chute beneath both magazines which terminate at an opening in the front of the cabinet where the customer may retrieve both cigarettes and matches.

The Fry patent 2,042,710 issued June 2, 1936 (DX–DY(1)) relates to a coin operated vending machine. It discloses a cabinet containing a front magazine for cigarettes and a rear magazine for matches, with separate ejector means for each. The bottom article in each is ejected rearwardly. The rear magazine is shorter than the front magazine and is positioned at an angle so that its base is closer to the front magazine than is its top (Fig. 1). Ejected matches pass through a chute located behind and beneath the match magazine. It is defined by plates which slope from the rear wall down towards the front of the cabinet. The cigarettes, when ejected, enter a lower extension of the same chute which continues in a forward direction until it abuts an opening in the front of the cabinet. The customer can retrieve the cigarettes and matches through this opening.

The Braun patent [Austrian] 137,399 issued April 25, 1934 (DX–BP) relates to a coin operated vending machine. It discloses a cabinet containing a rear magazine for cigarettes and a front magazine, described as a tube, for coins dispensed as change with each package of cigarettes (Fig. 1). The coin magazine, attached to the front wall, is spaced apart from the cigarette magazine. The bottom of the latter is lower than the bottom of the former. During a delivery operation, the bottom coin is rearwardly ejected and drops down in front of the cigarette magazine into a chute, the front boundary of which is the front wall of the cabinet. The bottom package of cigarettes is forwardly ejected

and enters the same chute, which exists below the coin magazine and generally below and forward of the cigarette magazine. The cigarettes and the ejected coins pass down through this common chute, coming to rest on its horizontal base which abuts an opening in the front of the cabinet through which the customer can retrieve his cigarettes and coins.

All of these prior art patents disclose chutes which at some point are used by both the articles being ejected and thus constitute "common chutes." In each instance, however, they are located either behind or in front of, the magazines; and generally beneath them. The E–2 chute is not an equivalent of the '102 chute. Rather it is the equivalent of the chutes disclosed in the prior art which Seeburg was free to use.[48] The E–2 therefore is found not to embody the common chute element disclosed in claim 1.

*The Framed Aperture*

The framed aperture element of claim 1 is described in the specifications as follows: "Into the outwardly bowed front 11 there is set an oblong frame 14, through which articles dispensed by the machine, as well as returned coins may be removed as they are ejected into mouth 14' of delivery chute XIV. The lower, inwardly directed portion of frame 14 abutting the bottom edge of chute mouth 14' is depressed so that the front edge of the frame forms an upward stiffening ridge for engaging the lower edge of the opening provided in the front panel of the cabinet for the reception of frame 14, whereby a retainer for articles delivered into the chute mouth is produced." [49]

The E–2, as already noted, has an opening in its front door through which ejected cigarettes and matches may be retrieved. An inward extension and integral part of the door, designated the "delivery tray," abuts the terminal of the chute, designated the "upper delivery tray." The forward end of the delivery tray is raised to form a lip which prevents the ejected articles from sliding out of the cabinet. The upper portion of the opening in the door also extends inwardly and then upward to form the "upper package guide" which directs downward cigarettes ejected from the cigarette magazine affixed to the inside of the door. The combination of these two inward extensions, together with two others forming the sides of the opening, creates a frame around the opening in the door, the lower portion of which "cooperates" with the end of the chute. The prior art patents do not reveal this element, all of them employing merely an opening in the cabinet door which abuts the end of the chute, and through which the customer may retrieve the purchased articles. These openings are not surrounded by recessed extensions as disclosed in '102 and used in the E–2.

Seeburg argued, and its expert Mr. Hughes testified, that the E–2 does not contain the framed aperture as disclosed in '102, because the frame on the E–2 is a part of the cabinet itself and not a separate frame unit attached to that portion of the cabinet surrounding the opening as described in '102 and as shown in its specifications and drawings. The argument is rejected. It is well settled that, the reading of a claim on a machine "cannot be escaped by merely joining . . two parts into one integral part * * * if the same results are accomplished in substantially the same way." [50] That is what Seeburg

48. Pressed Steel Car Co. v. Union Pacific R. Co., 270 F. 518, 524 (2 Cir. 1920); Grubman Eng'r & Mfg. Co. v. Goldberger, supra note 34; Delaware Company v. Taylor-Bell Co., 249 F.Supp. 471, 477 (S.D.N.Y.1966).

49. PX–78, col. 7, lines 62–74. See also Fig. 7.

50. Paul E. Hawkinson Co. v. Skogmo-Gamble, Inc., 20 F.Supp. 543, 551 (D. Minn.1937), rev'd on other grounds, 98 F.

has done here. It is found, therefore, that the E–2 embodies the "framed aperture" element disclosed in claim 1.

*The Operative Connection*

Claim 2 adds only two elements to those of claim 1 which it incorporates. They are (1) operative connection of the front magazine with the rear magazine and (2) movability of the former relative to the latter.[51] Seeburg does not dispute what is in any event obviously true, that the second of these elements is embodied in the E–2, but it vigorously contends that the first is not. It argues: "* * * the plain fact is that in the '102 patent the front *magazines* are *not* 'operatively connected' with the rear *magazines* so that cigarette and match packages may be simultaneously delivered. Rather, the respective ejecting mechanisms associated with these magazines are 'operatively connected' with each other. The magazines are merely storage holders (PX–78), and *they* can be and are 'operatively connected' with each other only in the sense that the match magazines are hingedly connected to the cigarette magazines. Such is not the case for the E2 structures, in which the match magazine is hingedly connected to the so-called 'hat section' of the vending machine cabinet." (emphasis in the original)[52] The argument is rejected. It completely misconstrues claim 2. Indeed it substitutes for what that claim read in light of the specifications actually discloses, a construction detail in one of Eastern's machines (DX–D) as testified to by Seeburg's expert Hughes. He said that the hinge on which the front magazine in that machine swung, was "grooved right into this corner of the rear magazine, so it is operatively connected, if you will, to the rear magazine[53] * * *." But neither the specifications nor the drawings suggest that in order to practice the invention disclosed in claim 2 it is necessary to use such a hinging arrangement.[54] The hinge's sole function is to allow movement by the front magazine and its efficiency does not depend on attachment to the rear magazine. It is hard to believe, in light of the File Wrapper history of '102, that the examiner would have found invention in such a mere construction detail as the locating of that hinge. Moreover, while it is true that the '102 ejecting mechanisms are "operatively connected," that circumstance, as will appear, not only does not negate the existence of such a connection between the front and rear magazines but rather constitutes it. The ejecting mechanisms after all do not exist in isolation; their functions are so related to those of their respective magazines that the latter necessarily are connected operatively to each other.

The match ejecting mechanism disclosed in '102 is part of the front magazine.[55] It is driven by the same electric motor that drives the mechanism which ejects cigarettes from the rear magazine.[56] As the specifications and drawings last referred to show, especially Fig. 9a, one part of the "actuating assembly" (XI) by which power is transmitted from the motor (XII) is connecting rod (69). This links the motor to another part of the assembly, gear segment (47), which in turn operates the mechanism (X) that ejects cigarettes from the rear magazine. The front magazine's match ejecting mechanism (XVI) is also linked to gear segment (47) by a third part of the assembly, connecting bar (63), and, accordingly, is caused to operate whenever mechanism (X) does, thereby effecting a simultaneous delivery of a package of ciga-

2d 37 (8th Cir. 1938). See Ellis, Patent Claims § 57 at 68–69 (1949) and cases cited therein.

51. ante pp. 7–8.

52. Seeburg's post-trial Brief re Count I of The Complaint p. 41.

53. R–3407.

54. See PX–78, col. 8, lines 39–41.

55. Id. col. 3, lines 33–35; col. 22, lines 10–42.

56. Id. col. 3, lines 13–19; col. 22, lines 44–61 and Figs. 4 and 9a.

rettes and a book of matches.[57] There is thus achieved one of the stated objects of the invention, namely, "the combination with a dispenser for main articles [here cigarettes], of a dispenser for secondary articles [here matches], and *in which latter dispenser is provided a* continuously and independently *movable secondary article ejector, opperative,* however, *by the actuating means for the main article ejector.*" [58] (emphasis supplied)

As already appears, a package of cigarettes, on being ejected from the E–2 rear magazine, depresses the "empty bar" attached to that magazine, thereby activating a solenoid which, in turn, activates the means for ejecting a book of matches from the front magazine.[59] The E–2 is found clearly to embody the operative connection element of claim 2.

## II.

## THE '788 PATENT

This patent was issued on December 1, 1959, upon the application of Anthony M. Caruso filed October 31, 1957.[60] It contains only one claim, "The ornamental design for a vending machine cabinet, substantially as shown and described." The design is shown in two drawings. The first, a perspective view, shows the front, left side, top and legs. The second shows only the top viewed from directly above. The description is, "The undisclosed end of the vending machine is substantially the same in appearance as the end shown, and the rear is substantially plain." [61] The drawings show a cabinet resting on four diverging legs. Its overall shape is rectangular. The corners and edges of the left and right side walls are rounded and each side wall contains a raised central panel which tapers inwardly toward the rear of the cabinet. The top, which slants slightly towards the rear of the cabinet, contains a row of raised selector "buttons" forward of and below which, in another row, are an equal number of related windows in which facsimiles of packages of various cigarettes may be displayed. Access to the interior is achieved by raising parts of the cabinet top which are connected by a hinge extending across the full width of the top and located behind the row of selector "buttons." The front of the '788 cabinet consists, in part, of a central panel the upper portion of which extends downward and outward from just below the row of windows to about half way to the bottom of the cabinet where it meets the forward edges of the side walls. From there the lower portion extends vertically to the bottom of the cabinet. This portion contains a transparent window surrounded on its top and sides by vertically striped panels. This window is purely functional. It makes visible, in accordance with state laws, the tax stamps on the packages of cigarettes.[62] Beneath the window is an opening, also functional, through which the ejected articles may be retrieved. The sides of the opening are bounded by the two vertical panels which also bound the window, thereby confining the opening to an area less than the full width of the cabinet front. The bottom of the opening is an outwardly projecting "lip" which extends almost the full width of the cabinet and prevents purchased articles from sliding out of the opening. It is located a short distance above the base of the cabinet and projects forward beyond the plane of the cabinet front.

The E–2 cabinet is also substantially rectangular in shape and it too rests on four diverging legs.[63] However, unlike the '788 cabinet, its corners and side walls are not curved. They are angled and the walls have no panels. Access to the interior is through a door which con-

57. Id. col. 1, lines 9–13.

58. Id. col. 5, lines 63–69.

59. ante p. 21. See also R. 3431–3435.

60. See note 5 ante p. 6.

61. PX–15.

62. See, e. g., New York Tax Law § 473; New York State Cigarette Tax Regulation 333.5.

63. PX–81.

stitutes the front of the cabinet, rather than through the top, as in the '788 design. The E–2's door is hinged along its full length to the forward edge of the left wall and at the forward edge of the right wall is an "opening" line of equal length. The top of the cabinet does not slant toward the rear as in '788. Its forward edge is the upper "opening" line of the door whose top extends above that opening line. The upper portion of the door slopes downward and outward for a short distance and within this area there are selector "keys." The '788 selector "buttons" project upward from the top of the cabinet and extend in a row along it. Each button is spaced a slight distance from the next. In contrast, the E–2 selector "keys" resemble bent piano keys rather than buttons and each has a slight indentation about the shape and size of one made by a finger tip. Moreover, the keys are set out in a row along the upper part of the door. They are not on the top of the cabinet as in '788. A further difference exists in the fact that the E–2 keys are not spaced apart but are contiguous. The E–2 has, corresponding to each key, a window through which a facsimile of various brands of cigarettes may be displayed. However, unlike the '788 arrangement, each key and window combination in the E–2 is a single, integrated unit. The upper portion of this unit is the window, which slopes sharply downward; the lower portion is the selector "key." Thus, whereas '788 locates its windows beneath its selector "buttons," the E–2 windows are located above the selector "keys." Below and in front of the E–2 keys is a plate extending the full width of the cabinet front. The word "cigarettes" is spelled out across this plate in well spaced letters about one inch high. Nothing remotely resembling this appears in the '788 design. Beneath this plate are the remaining portions of the E–2 front, the largest part of which is a central panel. The upper portion of this panel inclines downward and outward, the middle portion extends straight down and the lower portion extends downward and then inward. The upper portion, which begins at a point behind the plate bearing the word "cigarettes," is in some respects similar to the central panel disclosed in '788 but it has two quite noticeable differences. First, the '788 panel is bare of ornamentation while the E–2 has arrowheads, each two inches high, set out in two rows. The top row contains six and the bottom row contains five. The latter are located below the spaces which separate those in the top row. The 4E–2 has, instead of arrowheads, a single row of four transparent plastic "bubbles" inside each of which a package of cigarettes may be displayed. These bubbles project outward from the front of the 4E–2 cabinet and are capable of being illuminated by means of internal lights. No details of this sort appear in the '788 design.[64] The second difference is that the upper portion of the '788 panel extends in an unbroken plane between the side walls of the cabinet, whereas the corresponding portion of the E–2 panel is narrower than the full width of the cabinet front, the remaining space being filled by forwardly bent sides of the panel. As the E–2 panel extends downward and forward, these sides narrow so that they appear as inverted right triangles. They end at the middle portion of the panel which extends across the full width of the front. This portion has in it a window one and one-half inches high through which the tax stamps on the cigarette packages may be observed. Although the upper edge of the inwardly inclined lower portion of the panel extends across the full width of the cabinet, the lower edge of that portion does not. It is flanked by two trapezoidal sides. An opening, through which ejected articles may be retrieved, is recessed in the front of the cabinet. It is bound on the top by the lower edge

64. The use of such "bubbles" on a cigarette vending machine cabinet was disclosed in the earlier Spillman Design Patent 183,-028 (June 10, 1958) DX–EA.

of the panel and on the bottom by an inwardly projecting plate on which the trapezoidal sides of the lower portion rest. The forward edge of this plate is bent upward, forming a lip which prevents ejected articles from sliding out of the cabinet. This lip, unlike that disclosed in '788, does not project forward beyond the face of the cabinet front.

An opening in the front of a vending machine cabinet for making merchandise available to the purchaser, a device for disclosing tax stamps and the combination with means for displaying various brands of cigarettes, of means for making selections, were all disclosed in the prior art long before the application which issued as '788 was filed.[65] Moreover, similarities based on such mere functional elements do not constitute embodiment of the '788 design.[66] Whether Seeburg has embodied the '788 design in the E–2 depends on whether an ordinary purchaser of electrical cigarette vending machines looking at either the E–2 or 4E–2 as a whole, would be deceptively induced to buy it, thinking he was getting one with a '788 design cabinet.[67] There was only scant testimony respecting such purchasers but none of it showed or even suggested that any of them was ever so deceived. Indeed it is hard to see how anybody would be. In any event, the ordinary and usual purchasers of cigarette vending machines are so-called "operators" whose business is to place the machines in various locations such as bars, restaurants, bowling alleys, etc., to which the operators pay a commission. These operators are professionals. They are familiar with and buy machines of various makes. It is to the last degree unlikely that such sophisticated purchasers could mistake the appearance of an E–2 or a 4E–2 for a machine having a cabinet of '788 design. The court finds they would not. Accordingly, it is further found that Seeburg has not embodied the '788 design in the E–2 or 4E–2.

Whether Eastern is entitled as claimed in Count I to royalties under '102 or '788 depends on whether Seeburg, if it were not the assignee of those patents would, on the foregoing findings, be an infringer of either.[68] It is concluded it would not be. As to '788, it is unnecessary to add to what has just been set forth. As to '102, each of its two claims in issue is a combination claim and claim 2 incorporates all the "limitations" or elements of claim 1.[69] In order to infringe '102, therefore, Seeburg would have had to embody in the E–2 each element of at least one of the claims.[70] That, as has been found, it has not done. It has not embodied in the E–2 the common chute element disclosed in claim 1 and incorporated by reference in claim 2. Eastern, therefore, is not entitled as claimed in Count I to recover royalties from Seeburg under either '102 or '788.

*The Second Count*

This count charges that Seeburg breached an implied obligation which the purchase agreement imposed on it to exploit the assigned patents in good faith, by bringing out "newly created" commercially equivalent electrical ciga-

65. PX–6 through 10, advertising showing vending machines on the market prior to 1950.

66. Sunbeam Lighting Co. v. Pacific Associated Lighting Inc., 328 F.2d 300 (9th Cir. 1964); Bercy Indus., Inc. v. Mechanical Mirror Works, Inc., 274 F.Supp. 157, 161 (S.D.N.Y.1967); Tappan Co. v. General Motors Corporation, 248 F.Supp. 978, 986 (N.D.Ohio 1965), aff'd, 380 F. 2d 888 (6th Cir. 1967). See also 2 Walker, Patents § 179 at 835 & n. 9 (2d ed. Deller 1964).

67. Gorham Company v. White, 14 Wall. 511, 81 U.S. 511, 528, 20 L.Ed. 731 (1871); International Silver Co. v. Pomerantz, 271 F.2d 69 (2 Cir. 1959); Aileen Mills Co. v. Ojay Mills, Incorporated, 188 F.Supp. 138 (S.D.N.Y.1960).

68. Cold Metal Process Co. v. United Engineering & Foundry Co., 235 F.2d 224, 229 (3 Cir. 1956).

69. 35 U.S.C. § 112.

70. Reiner v. I. Leon Co., supra note 45 at 649 of 324 F.2d.

rette vending machines which do not embody any claim of any of the assigned patents, "*solely*" for the purpose of evading payment to Eastern of the prescribed royalties and not because of any economic necessity to meet competition. (emphasis supplied) [71]

Seeburg concedes it designed, manufactured and, commencing in June 1959, sold its E–2 which, as Seeburg contends and the court has found, does not embody any invention disclosed in any claim of any of the assigned patents. Seeburg denies however, that it did this to evade payment of royalties to Eastern. It contends its only purpose was to protect its name and reputation for quality merchandise which, it says, had been endangered by its royalty-bearing E–1's unsatisfactory performance as reflected in complaints from Seeburg's distributors and their customers.[72] Seeburg further contends that in any event "paragraph 16 of the Purchase Agreement unequivocally authorized Seeburg to market a royalty-free model of its own design without consideration of the transferred patents, and thereupon to stop sales of royalty-bearing machines, and * * * under that paragraph Eastern's sole remedy was its right to terminate the contract and thereby to recover the Vending Machine Patents and Special Equipment for a token $1 payment."[73]

Eastern, asserting it is "inconceivable" that it would have agreed to such a contract, rejects this construction. Moreover, it contends that even if the purchase agreement can be construed to permit Seeburg "to invent a machine outside the [assigned] patents * * * the right to make a non-royalty-bearing machine does not obliterate the duty to exploit * * * [and Seeburg] would have the duty to exploit machines containing [the assigned] patents at the same time that it exploited the permitted machine." [74]

Eastern does not dispute what is in any event well established, that an implied obligation to exploit assigned patents is not binding if its observance would prevent the assignee from meeting market competition with reasonable chance of success.[75]

Seeburg offered extensive testimony designed to bring it within this doctrine. The effort was not successful. The chief engineer of its logic systems engineering department, Jensen, by prolonged demonstration first practiced in his laboratory, showed that by using little more than a piece of a bent coat hanger wire and a steady hand, one with time and no interference, could remove up to the entire supply of cigarettes from Eastern's Electro–800 machine without paying for even one package. Other demonstrated cheating methods involved the added use of a screw driver and a flashlight; or an extension cord and an accomplice. Seeburg also introduced into evidence films made in its laboratory showing malfunctions of various parts of the E–1. Herrick, Seeburg's assistant sales manager in 1958 and 1959, testified that there had been many complaints,—"an avalanche"—about the E–1. He could not, however, recall the name of one complainer and he produced nothing in writing to support his statement. Seeburg did not call a single distributor or customer to support it. Herrick was an evasive witness and his testimony about "complaints" being inconsistent with Seeburg's sales and other records, is rejected. The most Seeburg showed by the in-court demonstrations was that there were some deficiencies in Eastern's Electro–800 and Mark II machines and its own E–1. It did not show by any evidence that adoption of the E–2 was necessitated by competi-

71. Complaint pars. 26–29.

72. Ans. pars. 16–17.

73. Defendant's Post-Trial Memorandum on Non-Patent Issues (Count II) p. 4.

74. R. 1828–29.

75. Mechanical Ice Tray Corp. v. General Motors Corp., 144 F.2d 720, 725 (2 Cir. 1944), cert. denied Horton v. General Motors Corp., 324 U.S. 844, 65 S.Ct. 679, 89 L.Ed. 1406 (1945).

tion from a better machine. The court finds it was not. Whatever defects there were in the E–1 did not prevent Seeburg from competing successfully. Its own records show that from May 1958 through May 1959 it sold 8,488 E–1 machines even though in July 1958 it increased the price to distributors from $270 to $320 per machine. Herrick reluctantly agreed on cross-examination that Seeburg's 1958 Annual Report was correct in stating that the company had "achieved a remarkable degree of success in connection with its entrance into the manufacture of cigarette vending equipment which occurred in May of 1958" and further that "as a result of this acquisition, Seeburg is now [October 1958] one of the largest manufacturers and distributors of cigarette vending machines."

Although both parties urge that the contract is clear and unambiguous on its face it does not seem so to the court, and evidence of the circumstances surrounding the prior negotiation and the drafting of the contract was received.[76]

The purchase agreement of April 8, 1958, states that Statler was negotiating to acquire control of Eastern, which was in the business of manufacturing cigarette vending machines, and that if and when Statler acquired such control Seeburg would purchase certain assets of Eastern's cigarette vending machine business. These assets included tools and dies [hereafter, "special equipment"], various patents, and Eastern's inventory of parts and materials. On April 21, 1958, Statler, Eastern and Seeburg executed a second agreement which confirmed the acquisition of control of Eastern by Statler and contained an assumption by Eastern of the rights and obligations of Statler under the purchase agreement of April 8, 1958.

At the time the negotiations began between Seeburg and Statler, Eastern was a corporation all the stock of which was owned by C-Eight Laboratories which, in turn, was a partnership wholly owned by the family of Mario Caruso. Eastern was then engaged in the manufacture of cigarette vending machines under nine patents issued in the name of Mario Caruso, two applications upon which patents subsequently issued in the name of Anthony Caruso, and under a royalty contract [hereafter, the Hoban agreement], giving it rights in patents previously assigned to C-Eight Laboratories by Fairfield Hoban. All Eastern machines were sold under the trade name "Electro." As the exclusive licensee of Statler, Eastern was also manufacturing another type of vending machine known as the "Lunch-O-Mat." Despite Eastern's express obligation under the Lunch-O-Mat agreement to use its best efforts to exploit the business, and an alleged agreement to sell a minimum number of machines per year, it became apparent by 1958 that Eastern's Lunch-O-Mat business was not meeting with much success. As a result, Statler asserted a claim against Eastern in the amount of $700,000, predicated on a failure to exploit and to produce the allegedly guaranteed minimum number of machines.

During the period that the Lunch-O-Mat sales were proving so disappointing, Eastern's cigarette vending machine business was also steadily declining to such a serious extent that Eastern was forced to pay salesmen's commissions, accountant's fees and other debts in machines rather than in cash. It was at this point that Statler first made inquiry as to whether Seeburg would be interested in entering the cigarette vending machine field. Up until then, although Seeburg had been manufacturing coin-operated phonographs [juke boxes], it had had only a brief excursion into the manufacture of vending machines.

Eastern's cigarette vending machine business, the subject of the "feelers," began around 1946 with the introduction of its C–8 machines. This descrip-

76. See Judge Frank's concurring opinion, United States v. Lennox Metal Mfg. Co., 225 F.2d 302, 309–315 (2 Cir.) concerning use of such evidence.

tion referred to the fact that the machine contained eight columns or magazines of cigarettes. In later years, Eastern introduced its C–10 and C–12 machines, all of which utilized what is known as a "top discharge ejector mechanism" in the delivery of cigarettes. In 1957, Eastern began to market its Mark II model, a twenty-two column machine introduced to facilitate the burgeoning sales of different brands of cigarettes, especially filtered cigarettes. Later in that year an enlarged version of the Mark II, known as the Electro-800, was introduced. This machine was identical to the Mark II in its functioning parts and differed only in design, the Electro-800 having an extension on its back which permitted the storage of an additional three hundred packages of cigarettes. Both the Mark II and the Electro-800 machines were bottom discharging machines in which the bottom package of cigarettes was ejected, through an opening in the bottom of the magazine, into a chute for ultimate delivery to the customer. The Mark II and Electro-800 machines, although initially well received, soon precipitated many complaints resulting in cancelled orders and the return of machines already shipped. To counter this situation, Eastern instituted an austerity program in the beginning of 1958, consisting of the aforementioned payment of debts in machines, and also the elimination of overtime work.

Before making any definite commitment to purchase, Seeburg received from Eastern samples of its Mark II and Electro-800 machines upon which Seeburg's engineering department performed numerous and extensive tests. Seeburg was also able to get some idea of the market acceptance of Eastern's machines by making inquiry of the distributors of its juke boxes, many of whom also distributed Eastern's cigarette vending machines. Whatever Seeburg's reaction was to these tests and opinions, it decided to proceed with the negotiations. Basic to the arrangements which ensued was the acquisition of Eastern's business by Statler. To accomplish this, the Carusos had to give up their interests in the Lunch-O-Mat and cigarette machines businesses. In return, they were discharged from all obligations arising out of their cigarette vending machine business, discharged from the $700,000 claim asserted against them by Statler, and, in addition, were to receive $150,000 compensation. Statler then transferred many of the assets of its newly acquired cigarette machine business to Seeburg under the purchase agreement.

The relevant provisions of the purchase agreement provided for the assumption by Seeburg of the Hoban agreement; the purchase of the "special equipment" used in the actual manufacture of the machines; and the assignment of all patents owned by Eastern relating to its cigarette vending machine business. The purchase price of the "special equipment" was $200,000. The payment for the patents was to be in the form of royalties at the rate of $7.50 per machine sold during the first two years following the closing, and $8.75 per machine sold thereafter until the date of expiration of the latest of the patents assigned. Both royalty rates were subject to a credit for any amounts paid to Hoban by Seeburg under the royalty agreement which it had assumed.

An analysis of the prior drafts of the April 8 agreement reveals that Eastern's initial proposals contained numerous safeguards, including [DX-AF] a proposed "guaranteed minimum" clause and a proposed express obligation to exploit. It is easy to see why Eastern would make such proposals: Seeburg had no prior experience in the cigarette vending machine industry; the parties had had no prior dealings with each other; and, Eastern was obviously aware of the import and the importance of such provisions under the circumstances. The express language of the proposed obligation to exploit would have required Seeburg not only to use its best efforts with respect to machines falling within the scope of the patents but also to re-

frain from dealing in other machines outside the scope of the patents.[77] The proposed guaranteed minimum clause would have required Seeburg to manufacture at least 6,000 machines per year and would have given Eastern the option to terminate in the event that less than 6,000 machines were manufactured in any one year or in the event that the royalties paid were less than those which would have been paid had 6,000 machines been manufactured. It is at least arguable that such a provision would have required Seeburg to pay royalties on 6,000 machines each year whether or not they were actually manufactured.

The next set of proposals [DX-AN] were actually counter-proposals emanating from Seeburg. These contained no guaranteed minimum clause but did give Eastern the option to terminate in the event that less than 6,000 machines were sold or in the event that the royalties paid amounted to less than that which would have been paid had 6,000 machines been sold. This proposal differed in two significant respects from Eastern's original proposal: while there was still a minimum number of machines specified, there was no guarantee connected therewith. This supports the inference that Seeburg believed, rightly or wrongly, that the original proposal would have obligated it to manufacture 6,000 machines every year and to pay royalties thereon even if no machines were manufactured, whereas under the counter-proposal Seeburg would be obligated to pay royalties only if it wanted to retain the assigned patents. The second difference is that the yardstick for royalties under the original proposal was the number of machines *manufactured* whereas the counter-proposal gauged royalties in terms of machines *sold.* Clearly, Seeburg's burden would have been greater under the original proposal.

The counter-proposals also contained the prototype for paragraph 16 with two significant differences: they did not state that Seeburg could "at any time" acquire, lease, etc.; merely that Seeburg could engage in such practices without stating when it could do so. The second significant difference is that the counter-proposal contained no termination provision. Thus, even if Seeburg dealt in machines outside the scope of the vending machine patents, neither Eastern nor Seeburg could terminate.

The next draft [DX-AS], also prepared by Seeburg's attorneys, contained a provision very similar to that appearing in paragraph 16 of the final contract, including the use of the opening phrase "Buyer at any time hereafter" and including the rights of either party to terminate. One significant difference, however, is that under this proposal, in the event of termination, Seeburg's only duty was to sell the "special equipment" and to reassign only those patents acquired from Eastern.

In response to these proposals, the attorney for Statler suggested certain changes [DX-AV-2] which included the following: if Eastern exercised its option to terminate because of the failure of Seeburg to sell 6,000 machines, Seeburg would be obligated to sell back the

77. DX-AF, paragraph 4, provided, in part, that the defendant would agree to "at all times use its best efforts to develop and expand the use of such machines, that it or its assigns will manufacture, sell and lease only cigarette vending machines which embody the use of said patents, inventions and improvements, and that neither it nor its assigns, directly or indirectly, will manufacture, promote, sell or lease any competing type of such machine or any cigarette vending machine which does not embody the use of any of said patents, inventions or improvements." For the purposes now under discussion, it is irrelevant that such a provision would have been illegal and unenforceable. F. C. Russell Co. v. Consumers Insulation Co., 226 F.2d 373 (3rd Cir. 1955); McCullough v. Kammerer Corp., 166 F.2d 759 (9th Cir.), cert. denied, 335 U.S. 813, 69 S.Ct. 30, 93 L.Ed. 368 (1948); Columbus Automotive Corp. v. Oldberg Mfg. Co., 264 F.Supp. 779 (D.Colo.1967). The mere presence of such a provision is indicative of the plaintiff's intention to bind the defendant to certain obligations.

"special equipment," to reassign the "vending machine patents" and to sell "all other patents, inventions and improvements made, owned and otherwise acquired by * * * [Seeburg] and utilized at any time in the manufacture of Vending Machines;" whereas, in the event of either party's termination under the equivalent of paragraph 16, Seeburg would have to return the "special equipment," to reassign the vending machine patents acquired and to deliver all other patents, inventions and improvements made, owned and otherwise acquired by Seeburg and utilized at any time in the manufacture of vending machines, for all of which Eastern would pay only one dollar.

In the contract as signed Seeburg is obligated to pay royalties only on those machines sold which utilize at least one claim of one of the assigned patents. Under paragraph 15, if Seeburg sells less than 6,000 machines in any calendar year or if it fails to make a deficiency payment, Eastern has the right to terminate. If such right is exercised Seeburg must sell back the "special equipment," [78] reassign the assigned patents and *sell* [79] any improvements on the patents and any patents issued on such improvements. If termination, by either Eastern or Seeburg, arises under paragraph 16 Seeburg must, for the sum of one dollar, sell back the "special equipment," all of the assigned patents and all improvements on the patents and any patents issued on such improvements. The paragraph contains the proviso that "nothing in this paragraph 16 shall be construed as obligating * * * [Seeburg] to transfer or assign to * * * [Eastern] any patents, inventions or improvements which were not embraced in the [assigned patents] and were created and developed after the Closing and which * * * [Seeburg] is using or expects to use in the manufacture of electric cigarette vending machines which are outside the scope of the [assigned patents]."

These drafts, examined in light of the contract as signed, reveal that Eastern initially sought to impose conditions which would have required Seeburg to manufacture a minimum number of machines yearly, to use its best efforts to achieve or exceed this figure and to deal exclusively in cigarette vending machines within the scope of the assigned patents. Seeburg, judging from its counter-proposals, refused to bind itself to deal exclusively in cigarette vending machines within the scope of the patents and additionally refused to be obligated, under all circumstances, to either sell royalty-bearing machines or pay the equivalent royalties. Instead, Seeburg sought the option to retain its rights under the contract by making a deficiency payment and, in general, manifested an intent to be subject to no

78. The repurchase price of the "special equipment" is to be computed on a straight-line depreciation basis as follows: "$200,000 (a) less a sum equal to $5.00 for each Vending Machine (but in no event more than 40,000 machines) sold by Buyer during the period from the Closing Date to a date six months after the giving of such written notice [of termination] by Seller, or (b) less a sum equal to $5,555.55 for each month from January 1, 1959 to and including December 31, 1961, whichever of such sums (a) or (b) shall be greater. * * *" PX–1, paragraph 15.

79. Although paragraph 15 of PX–1, the purchase agreement, requires the defendant to reassign the vending machine patents and to "sell to Seller all the Special Equipment, all improvments on the Vending Machine Patents and any patents issued on such improvements which Seller elects to include in said sale * * *" and although the repurchase price of the "special equipment" is set forth, the agreement is conspicuously lacking in any set price or any formula for computing the price of the improvements on the patents. It is not necessary to determine whether a "reasonable" price would be supplied or whether the agreement would be deemed unenforceable because of indefiniteness. It is sufficient to note the presence of the provision and the fact that it is an indication of the understanding and the intention of the parties that the plaintiff was not to receive these patents gratis.

greater obligations than would have been imposed had the agreement in question been a non-exclusive license. As a rule, non-exclusive licensees are under no obligation to exploit since the "license is merely an agreement by the licensor not to sue the licensee for infringement * * *."[80] They are generally free to use or not use the patents as they choose. Eastern, however, was obviously unwilling to give up its patents for nothing more than such a tenuous promise. It would appear that it was for this reason that the termination provisions under paragraph 16 were made more onerous on Seeburg than those under paragraph 15. In the event of termination, by either party, under paragraph 16 Eastern would reacquire the "special equipment" for only one dollar rather than the depreciated repurchase price established under paragraph 15. In addition, under paragraph 16 Eastern would acquire all improvements on the patents and acquire all patents on such improvements for the same one dollar purchase price, whereas under paragraph 15 Eastern would be obligated to *purchase* such improvements and patents on such improvements. Thus there were certain compensatory provisions which favored Eastern over Seeburg in the event of termination under paragraph 16.

Although Eastern objected to the introduction of the prior drafts of the contract, claiming that such documents were inadmissible under the parol evidence rule, it offered into evidence some copies of the prior drafts, allegedly for the sole purpose of "completing the record." In its post-trial arguments, Eastern again took the position that such evidence, having been improperly admitted, should not be considered and that, in any event, the "missing witness doctrines" compelled an inference favoring the obligations asserted by and relied on by Eastern. The prior drafts introduced by both parties were introduced through Mr. Charles Trynin, the present attorney of record for Eastern and its draftsman in the negotiations. The draftswoman for Seeburg was in court at all times, as was Seeburg's president. Eastern argued that because Seeburg failed to call these potential witnesses and question them respecting the "meaning of the contract" the inference arises that their testimony would have been adverse to Seeburg. This doctrine, however, is a two-way street, and a similar inference could arise in Seeburg's favor because of Eastern's failure to question Mr. Trynin, who was actually called as a witness, as to the meaning of the contract.[81] Furthermore, the "missing witness doctrine" is not applicable where the uncalled witnesses could not have testified or if their testimony would have been merely cumulative.[82] The witnesses here in question could only have testified as to their expressed intent; testimony as to their unexpressed intent would have been inadmissible.[83] Since the prior drafts

80. Ellis, Patent Licenses, § 146 at 159 (3rd ed. 1958).

81. Whether the inference will arise against either party and the strength of that inference is contingent on various factors. United States v. Llamas, 280 F.2d 392 (2 Cir. 1960). See United States v. Armone, 363 F.2d 385, 404–405 (2 Cir.), cert. denied, Viscardi v. United States, 385 U.S. 957, 87 S.Ct. 391, 17 L.Ed.2d 303 (1966). Here, these factors tend more strongly toward an inference against Eastern. It had the burden of proof on the question of whether an obligation should be implied into the contract. Since the implication arising from a comparison of the prior drafts with the final contract is that no such obligation should be implied, and since the plaintiff reopened its case to introduce some of these prior drafts, there was no reason why it could not have questioned Mr. Trynin at that time. See McCormick, Evidence § 249 at 534 (1954).

82. United States v. Llamas, supra note 81; McCormick, op. cit. supra note 81 at 533–36.

83. 2 Walker, Patents § 344 at 1418 (Deller ed. 1937): Even if the language of an assignment is ambiguous, "The parties will never be permitted to testify what they intended to signify by the language they

contained their expressed intent, they could not have added anything. Accordingly, no inference arises against Seeburg predicated on the "missing witness doctrine."

Eastern argued that if Seeburg did not intend to pay royalties and if Eastern did not expect to receive royalties, there would be no reason for the extensive and detailed royalty provisions. The answer to this, of course, is that Seeburg never stated that under no circumstances were royalties to be paid. Quite the contrary, the contract provides for the eventuality that Seeburg would deal in machines within the scope of the patents. In such eventuality it was necessary to establish the terms and amounts of royalty payments. These provisions do not, however, denote an obligation to exploit, for even nonexclusive license agreements contain royalty provisions and that alone has never been construed to evidence an obligation to exploit.

Neither is the "6,000 machine minimum" clause evidence of an obligation to exploit. This merely manifests Eastern's belief as to what is the reasonable value of the patents, and supports this belief by providing that if Seeburg disagreed and failed to pay this amount, Eastern would be entitled to recover its patents and deal with someone else. A guaranteed minimum clause, explicitly worded so as to obligate Seeburg to either manufacture, sell, or pay royalties under any and all circumstances is what these sophisticated draftsmen would have used to insure exploitation.[84] As for the agreement by Eastern and Statler not to compete, these facts do not carry the same weight which similar facts have carried in other cases. For example, in General Finance Corp. v. Dillon,[85] the court noted: "Surely Dillon did not intend to give up a business that was netting him $1500.00 per month, dissolve his corporation, transfer all his patents, tools, equipment, patterns, discs, molds and testing equipment, and turn over his customer lists and advertising matter to appellants, and further agree that any new inventions or improvements to existing inventions should be offered to appellants and made available to them without getting something in return other than an agreement that appellants would develop and promote the business if they chose to do so."[86] Here, Statler was agreeing not to engage in a business which it had, only the very same day, acquired and assigned, and Eastern was agreeing not to engage in a business in which it was failing. Nor did Eastern agree to offer additional improvements to Seeburg. In fact, the termination provisions call for just the opposite result.

In interpreting exclusive license agreements or assignments, courts generally have implied an obligation to exploit. However, parties still have freedom of contract and if they wish to agree to exclude such an obligation they

used, because if they were, assignors might narrow and assignees might widen the scope of the rights conveyed by simply making oath to alleged former states of their own minds." See also, Reconstruction Finance Corp. v. United Distillers Prods. Corp., 113 F.Supp. 468, 484–485 (D.Conn.1952), aff'd, 204 F.2d 511 (2 Cir. 1953).

84. See Amerian Sealcone Corp. v. Sylvan Seal Milk, Inc., 42 F.Supp. 480, 482 (E.D.Pa.1941): "Moreover, there is no reason to imply a promise such as plaintiff contends for in this case. Plaintiff did not reply on the royalties as its sole compensation * * *. Nor did it stipulate for minimum royalties." See also, Woodling, Inventions and Their Protection at 432 (2d ed. 1954): "In exclusive licenses granted on a royalty basis, the licensor, in order to protect his rights fully and to make certain that the licensee will continue to market and sell the patented invention, should seek a minimum royalty payable each year."

85. 172 F.2d 924 (10th Cir. 1949).

86. Id. at 927. It should also be noted that the court in the Dillon case referred to the defendant's agreement to produce "'on a quantity scale.'" Id. at 926.

may do so.[87] The policy underlying the obligation to exploit has been stated, in Mechanical Ice Tray Corp. v. General Motors Corp.,[88] as follows: "the productiveness of the licensor's property having been placed solely within the control of the licensee, a covenant on its part to work the patent in good faith to make it produce royalty income will be implied." [89] This reasoning is inapplicable to the instant facts for two reasons. Eastern's property was not placed solely within the control of Seeburg since Eastern had the right to terminate in the event Seeburg sold machines outside the scope of the vending machine patents.[90] Secondly, paragraph 16, in light of its genesis, expressly relieves Seeburg of the obligation to make the patents produce royalty income, and an express covenant precludes the implication of a contrary implied covenant. The court, in Mechanical Ice Tray, concluded that the theory of implied obligation is that "not to hold the licensee to that standard of conduct would be unfair and inequitable as between the parties to the license." No such unfairness or inequity results when parties, dealing at arms length, through competent counsel, agree that no such obligation should be read into their contract.

Eastern contends that, in any event, Seeburg was not given the right to invent its own machine without using any of the assigned patents. Seeburg's obligation, if one were to be implied, would be to *manufacture and sell* machines utilizing the assigned patents. Assuming such an obligation existed, it would not prevent Seeburg from inventing its own machine; it would only prevent it from manufacturing and selling such a machine without first having exploited the assigned patents. Therefore, if Seeburg is liable, it is for manufacturing and selling its own machines. However, there can be no liability predicated on these acts of Seeburg since paragraph 16 specifically permits the "manufacturing" and "selling" of "machines outside the scope of the [assigned patents]." [91] Eastern urges a singular construction of paragraph 16, to wit, that Seeburg may "manufacture" cigarette vending machines outside the scope of the patents only if they have been "acquired" or "leased" from a third party. Seeburg is given certain rights with respect to cigarette vending machines outside the patents: it may acquire them, lease them, manufacture them, deal in them, sell them or otherwise dispose of them. The object of all these transitive verbs is "cigarette vending machines." Eastern would misconstrue some of these verbs as adjectives modifying the verb "manufacture." Nothing in the contract or in the circumstances surrounding its drafting supports the suggested construction of paragraph 16 and it is rejected.

Nor can it be said that Seeburg acted inequitably or played "dog-in-the-man-

87. See Scales, Best Efforts and Implied Obligations in Patent Licenses, 41 Marq. L.Rev. 385, 393 (1958); also Smith, Patent Law 1191 (rev. ed. 1964).

88. 144 F.2d 720 (2 Cir. 1944), cert. denied, Horton v. General Motors Corp., 324 U.S. 844, 65 S.Ct. 679, 89 L.Ed. 1406 (1945).

89. Id. at 725.

90. See Kennedy v. Engelhard Indus. Inc., 288 F.2d 642, 647 (3d Cir. 1961); also Hensley Equip. Co. v. Esco Corp., 383 F.2d 252, 266 (5th Cir. 1967).

91. See 144 F.2d at 725: "Assuming, arguendo, that there was an implied covenant not to compete with the licensed trays except to meet outside competition, this manufacture and sale of the type 4 tray was not a breach of it provided the parties had agreed that the defendant might make and sell that tray royalty free. The exercise of good faith in exploiting the licensed patents did not require the defendant to refrain from doing whatever the plaintiffs had expressly agreed that it might do. No obligation not to manufacture and sell whatever kind of trays the license gave the defendant the right so to manufacture and sell can be implied and of course there can be no breach of a non-existent obligation."

**1152**

ger"[92] since it had informed Eastern as early as June, 1959, that it was dealing in machines which, allegedly, were outside the scope of the patents, and it had offered, as early as November 30, 1959, to terminate the agreement and return the patents and special equipment and to waive the six months notice requirement.[93] By offering to waive the notice requirement, Seeburg effectively prevented the assertion that it was repressing competition, i. e., by putting Eastern's patents "on ice" while at the same time preventing Eastern from reacquiring and possibly reassigning them.[94]

Paragraph 16 of the purchase agreement gave Seeburg the right to manufacture and sell a royalty-free machine of its own design without first having to exploit the assigned patents and the E–2 machines were manufactured and sold as permitted by paragraph 16. There can be no breach of a non-existent obligation and Seeburg can not be held liable for doing the very acts which the contract permitted it to do.[95]

In light of the foregoing, it is not necessary to consider Seeburg's charges of patent misuse.

■ Seeburg seeks an award of counsel fees under 35 U.S.C. § 285 which provides: "The court in exceptional cases may award reasonable attorney fees to the prevailing party." There was no bad faith on Eastern's part and no

ground to categorize this as an "exceptional case." Seeburg's request is denied.[96]

Judgment may be entered in accordance with the foregoing.

---

92. Id. at 727 (dissenting opinion).

93. DX–BA.

94. See Comment, 49 Mich.L.Rev. 738, 751–52 (1951). See also, Hensley Equip. Co. v. Esco Corp., 383 F.2d 252, 266 (5th Cir. 1967).

95. See note 91 supra. See also HML Corp. v. General Foods Corp., 365 F.2d 77, 81 (3d Cir. 1966) : "The choice lies between implying a promise to correct an apparent injustice in the contract, as against holding the parties to the bargain which they have made. The latter alternative has especial force where the bargain is the result of elaborate negotiations in which the

parties are aided by counsel, and in such circumstances it is easier to assume that a failure to make provision in the agreement resulted not from ignorance of the problem, but from an agreement not to require it."

96. See, e. g., Delamere Co. v. Taylor-Bell Co., 249 F.Supp. 471, 479–480 (S.D.N.Y. 1966) ; Bussemer v. Artwire Creations, Inc., 231 F.Supp. 798, 805 (S.D.N.Y. 1964). See also Teleflex Inc. v. American Chain & Cable Co., 273 F.Supp. 573, 588 (S.D.N.Y.1967) : "The general rule is that an award of attorneys' fees must be based upon a finding of bad faith on the part of the losing party."