**EASTERN ELECTRIC, INC., Plaintiff-Appellant,**

v.

**The SEEBURG CORPORATION, Defendant-Appellee.**

**No. 724, Docket 33958.**

United States Court of Appeals, Second Circuit.

Argued April 27, 1970.

Decided June 2, 1970.

William T. Sullivan, Arthur A. March, New York City (Charles Trynin, Willkie, Farr & Gallagher, Sumner S. Kittelle, Charles E. Lewis, New York City, on the brief), for plaintiff-appellant.

William P. Hindman, New York City, Ronald L. Engel, Chicago, Ill. (Townley, Updike, Carter & Rodgers, New York City, Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., on the brief), for defendant-appellee.

Before HAYS, ANDERSON and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

Plaintiff Eastern Electric, Inc. formerly manufactured electrical cigarette vending mchines, holding several patents in the field. By a written Purchase Agreement dated April 8, 1958, Eastern sold its entire cigarette vending machine business, including its patents, to defendant The Seeburg Corporation.[1] Seeburg promised, *inter alia*, to pay royalties on each electrical cigarette vending machine sold that utilized the Eastern patents, referred to in the agreement as the Vending Machine Patents. After paying royalties of more than $50,000 on almost 8,500 machines which utilized those patents, Seeburg commenced manufacture in 1959 of various other types of electrical cigarette vending machines which allegedly did not employ the Eastern patents. Since that time Seeburg has refused to pay further royalties under the Purchase Agreement.

In 1960, Eastern sued for breach of contract, claiming royalties and damages. The suit was filed in the state courts, from which it was removed to the United States District Court for the Southern District of New York. At trial, Eastern advanced two theories under which Seeburg would be liable: (1) the Seeburg machines utilized the Eastern patents, entitling Eastern to royalties under the Purchase Agreement; and (2) Seeburg's introduction of non-royalty machines breached its implied obligation to exploit Eastern's patents. A five-week non-jury trial was held before John F. X. McGohey, J., who ruled for defendant Seeburg. In a thorough opinion reported at 310 F.Supp. 1126 (S.D.N.Y.1969), the judge held that the Seeburg machines did not employ the Eastern patents and that the express language of the Purchase Agreement negated any implied duty to exploit them. We affirm.

I.

Appellant Eastern's first claim is that it is entitled to royalties under the Purchase Agreement. Eastern initially claimed before the trial court that appellee Seeburg had utilized at least four of the assigned patents in its products without paying royalties thereon. After trial, Eastern limited its claim to two patents, both of which the trial judge found are not embodied in the Seeburg machines. On appeal Eastern has limited

---

1. The Purchase Agreement was actually between Statler Manufacturers Corp., then negotiating for control of Eastern, and Fort Pitt Industries, Inc., which later became The Seeburg Corporation.

By agreement dated April 21, 1958, between Fort Pitt, Statler and Eastern, the Purchase Agreement of April 8, 1958 was reaffirmed by all parties.

its claim further; it now contends only that patent 2,593,102 (the '102 patent) covering the means for simultaneous delivery of cigarettes and matches by use of a common chute, is employed in Seeburg machines which contain match dispensing mechanisms. The trial judge heard extensive evidence concerning this claim, and concluded that appellee did not use patent '102 in the models on which it did not pay royalties. We have examined the record, and find that Judge McGohey's conclusion, far from being clearly erroneous, is amply supported by the evidence.

Eastern makes much of the court's "finding" that claims contained in patent '102 are "somewhat abstract and so it is possible to read them literally on Seeburg's [machine]." 310 F.Supp. at 1135. Appellant contends that this statement is inconsistent with the court's later finding that Seeburg did not use the essence of the patent. The trial judge found that "'102 pertains to a machine employing a top discharging and forward ejecting cigarette magazine," id. at 1135, and that accordingly "it was essential that the cigarettes pass through an enclosed structure in the space separating the magazines." Id. Appellee's machines, however, are bottom discharging, thus eliminating the need for the type of common chute described by patent '102. The trial judge found that this was an "essential difference" between the two types of machines. Id. Eastern offers a number of reasons why this finding cannot be sustained. We have considered them all and conclude that Judge McGohey's determinations were correct and that appellee Seeburg does not owe Eastern royalties under this patent.

## II.

Appellant's second claim presents more difficult questions. Citing such cases as Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 118 N.E. 214 (1917), and Mechanical Ice Tray Corp.

v. General Motors Corp., 144 F.2d 720 (2d Cir. 1944), cert. denied, Horton v. General Motors Corp., 324 U.S. 844, 65 S.Ct. 679, 89 L.Ed. 1406 (1945), Eastern contends that Seeburg breached an implied obligation to exploit the assigned patents when it ceased the manufacture of vending machines embodying them and substituted a royalty-free line of its own design. We do not quarrel with the propositions that "We are not to suppose that one party was to be placed at the mercy of the other" and that an agreement can be "instinct with an obligation" not explicitly expressed. Wood v. Lucy, Lady Duff-Gordon, supra, 222 N.Y. at 91, 118 N.E. 214. See Perma Research & Development Co. v. Singer Co., 410 F.2d 572, 574 n. 8 (2d Cir. 1969). It is also true that in Mechanical Ice, we recognized that these principles might impliedly require an exclusive licensee to exploit the patents upon which it pays royalties dependent upon use, although in that case we reversed a judgment for the licensor. Indeed, in the opinion below, Judge McGohey noted that "[i]n interpreting exclusive license agreements or assignments, courts generally have implied an obligation to exploit," 310 F. Supp. at 1150, a statement which, as applied to patents, finds support in authority.[2] But, as the trial judge also noted, the parties may provide otherwise. Moreover, the basis of the rule for which Eastern contends was explained in the case upon which it relies:

Whatever may be left of the rule of implied covenant of an exclusive licensee to exploit the licensed device in in good faith rests, as the doctrine always has rested, upon the ground that not to hold the licensee to that standard of conduct would be unfair and inequitable as between the parties to the license.

Mechanical Ice Tray Corp. v. General Motors Corp., supra, 144 F.2d at 725. Therefore, in resolving the question whether an obligation to exploit should

2. See 4 Deller, Walker on Patents § 407 (2d ed. 1965); Comment, 49 Mich.L.Rev. 738 (1951); cf. Corbin, Contracts §§ 568, 570 (1960).

be implied, the crucial issues are what the agreement provides and where the equities lie.

In the present case, the trial judge properly focused on paragraph 16 of the Purchase Agreement as the key provision. It begins as follows (for Buyer, read Seeburg, and for Seller, Eastern):

> Buyer at any time hereafter and without being subject to the restrictions of this Agreement in any respect may *acquire, lease, manufacture, deal in, sell or otherwise dispose* of cigarette vending machines other than those within the scope of the Vending Machine Patents, and Seller shall not have any right to receive any payment in respect of the sale by Buyer of any cigarette vending machines which are outside the scope of the Vending Machine Patents, nor shall Seller have any other rights in respect thereof under this Agreement, it being expressly agreed that this Agreement applies only to the sale of Vending Machines by Buyer in the manufacture of which one or more of the Vending Machine Patents is utilized. [Emphasis added.]

On its face, this language provides powerful support for Seeburg's position that it had no obligation to exploit the Vending Machine Patents, since the agreement explicitly recognizes that Seeburg could deal in machines not covered by the Vending Machine Patents and that Eastern would not be paid for such sales. Appellant, however, contends that the provision does not help Seeburg because it did not specifically grant Seeburg the right *to invent* a machine outside the Eastern patents, which is what Seeburg did. However, reliance on the absence of "invent" in the string of all-inclusive permissions ("acquire, lease, manufacture, deal in, sell or otherwise dispose

of") is not persuasive, particularly when other nearby provisions of the contract are taken into account. Thus, the immediately preceding paragraph (15) covers Eastern's right to terminate the Purchase Agreement, which is discussed in greater detail below. It is worth noting here, however, that if Eastern did terminate, paragraph 15 provides:

> Nothing hereinabove contained shall be construed as requiring Buyer to sell to Seller or assign to Seller any other patents, *inventions* or rights, or tools, dies, molds, devices, equipment, materials or parts pertaining to any cigarette vending machines which do not embody any of the Vending Machine Patents which Buyer may at such time be manufacturing or selling. [Emphasis added.]

While the above language is used in a different context, it indicates that Seeburg, the Buyer, could make use of inventions concerning electrical cigarette vending machines which did not employ the Eastern patents and does not suggest that the invention had to be someone else's. In another portion of paragraph 16, the contract supports a similar conclusion.[3]

Therefore, we agree with the trial judge that the contract does indicate that Seeburg had the right to sell electrical cigarette vending machines of its own invention. The inference that this negates an implied obligation to exploit the Eastern patents is strong. The inference is not weakened by the negotiations of the parties, which Judge McGohey correctly allowed into evidence and upon which he relied in part. There was much evidence before the judge regarding prior drafts of the agreement. That evidence showed that Seeburg refused to accept an Eastern proposal to include a guaranteed minimum royalty, an explicit "best efforts" clause, and a prom-

---

3. [N]othing in this paragraph 16 shall be construed as obligating Buyer to transfer or assign to Seller any patents, *inventions* or improvements which were not embraced in the Vending Machine Patents and were created and developed after the Closing and which Buyer is using or expects to use in the manufacture of electric cigarette vending machines which are outside the scope of the Vending Machine Patents. [Emphasis added.]

ise to deal only in machines using the Eastern patents. It is surely of some significance in deciding whether an agreement contains an implied obligation that the party so arguing tried to make the obligation explicit and failed. Eastern points to the fact that one of Seeburg's attorneys had noted in pencil on an early draft of the agreement a proposal, presumably ancestor to paragraph 16, which included the word "invent," but we do not regard that as equally significant.

Appellant also relies on the equities, arguing that an implied obligation to exploit is required because otherwise the Purchase Agreement is rendered "a *nudum pactum*," putting Eastern completely at the mercy of Seeburg. The contract provided for sale of appellant's entire cigarette vending machine business to Seeburg, including all Eastern patents and rights related thereto, its inventory of completed and partially completed machines, and "Special Equipment" (e. g., tools and dies) needed for manufacturing Eastern-designed machines. Seeburg promised to pay royalties on Eastern machines sold and indeed in the first year paid some $50,000 on about 8,500 machines. Under the contract, Seeburg also purchased the inventory for $88,277, and bought the Special Equipment for $200,000, half in cash and the remainder by promissory note secured by a chattel mortgage. It must be remembered that at the time the agreement was made, it was between Seeburg and Statler, and the latter was about to acquire control of Eastern.[4] It is quite clear that Statler wanted to dispose of Eastern's failing cigarette machine business [5] and have Seeburg assume substantial obligations thereunder. Moreover, the acquisition by Statler of cash in the amounts set forth above enabled it to acquire control of Eastern and pay off substantial Eastern debts. To disregard these contemporaneous transactions would be unduly myopic.

In addition, Eastern was not unprotected by the agreement. Paragraph 15 provided that if Seeburg sold less than 6,000 machines in a year and did not make a "Deficiency Payment," Eastern had the right to terminate the agreement on six months notice with provision for reassignment of the patents and repurchase by Eastern of the Special Equipment at $200,000 reduced by a formula depending on either how long the agreement had been in effect or how actively the patents had been exploited. Moreover, paragraph 16, which provided that Seeburg could deal in other machines, also gave Eastern the right to terminate under more favorable conditions if Seeburg did so deal. In that event, Eastern was entitled to reassignment of the Vending Machine Patents and to return of the Special Equipment for one dollar. Appellant contends that this was of no significant benefit to it, asserting that the Special Equipment was likely to be used up and, at any rate, was of no use to anyone but a manufacturer of electrical cigarette vending machines. But Eastern would also regain the patents themselves and be free to reassign them to a third party who could exploit them more to Eastern's satisfaction, not an unreasonable possibility considering its argument that the patent rights were of great value. We have great difficulty in characterizing all of this as *nudum pactum*.

Finally, as Judge McGohey pointed out, 310 F.Supp. at 1151, it cannot be said that "Seeburg acted inequitably or played 'dog-in-the-manger,' " a consideration that led to the dissent in Mechanical Ice Tray Corp. v. General Motors Corp., *supra*, 144 F.2d at 727. As early as June 1959, Seeburg informed Eastern that it was dealing in machines outside the scope of the patents, and only a few months later, Seeburg offered to terminate the agreement and waive a six-months notice requirement. Thus, it cannot fairly be said that Seeburg was

---

4. See note 1, *supra*.

5. Statler retained Eastern's "Lunch-O-Mat" vending machine line, which Eastern had been manufacturing as Statler's exclusive licensee.

trying to put Eastern's patents "on ice" while Seeburg sold its own products.

In sum, we agree with the trial judge that the agreement, as construed, is neither devoid of consideration nor inequitable. In the present case the negotiations were fair and the parties not unevenly matched. Judge McGohey found that the Purchase Agreement itself expressly "gave Seeburg the right to manufacture and sell a royalty-free machine of its own design without first having to exploit the assigned patents," and that "[t]here can be no breach of a non-existent obligation and Seeburg cannot be held liable for doing the very acts which the contract permitted it to do." 310 F.Supp. at 1152. See Mechanical Ice Tray Corp. v. General Motors Corp., *supra*, 144 F.2d at 726. We agree, and find that the Purchase Agreement precludes implication of an obligation on Seeburg to exploit the Eastern patents.

Judgment affirmed.[6]

---

6. We do not find it necessary to consider Seeburg's contentions regarding alleged patent misuse by Eastern.